MONROE, J.
The defendants, D. H. Thompson and C. A. Thompson, having-been convicted of manslaughter and duly sentenced, prosecute this appeal, and present their case to this court by means of the bills of exception which will now be considered.
Bill No. 1 shows that A. E. Calcóte, called as a juror, and examined on his voir dire, stated that his wife was a cousin of the accused, though, how near, he did not know; whereupon the court ordered him to stand aside without affording counsel for the accused an opportunity to examine him; that P. C. Allen, summoned as a tales juror, answered that he would not convict on circumstantial evidence alone, whereupon he was ordered by the court to stand aside, without giving counsel for the accused an opportunity to examine him; that A. J. Murray, having represented himself as a tales juror, the court refused to permit him to be examined, and, in the presence of the jurors already impaneled, made use of the following language:
“I order A. J. Murray sent up by the sheriff as a tales juror, to stand aside, because the sheriff violated the instructions of the court in sending him up here. The instructions were that he (the sheriff) should go east of town- to get tales jurors. The court intends to see that impartial jurors are secured who know nothing about the case. Mr. Murray is from the northwest portion of the parish—that portion where the homicide is alleged to have taken place; that - Gay, appearing as a tales juror, stated on his voir dire that he had neither formed nor expressed an opinion in the case; that he had no bias or prejudice for or against the accused; that he felt some sympathy in the case, which, however, he felt he could disregard, and which would not influence him in rendering his verdict, which he felt prepared to do according to law and the evidence as developed in the case.”
Whereupon he was challenged by the state, for cause, and the challenge was sustained by the court. To all of which rulings counsel for accused excepted.
The bill contains a further recital on behalf of the accused to the following effect, to wit: That the case was called for trial on Monday, and that three jurors from the regular venire were accepted, when the court, after ordering the sheriff to summon tales jurors from the eastern and the southern portions of the parish, adjourned; that the tales jurors presented themselves, from time to time, in small numbers, and were examined on Tuesday and Wednesday, and that counsel for the accused at no time had a complete list of the jurors so summoned; and that though the accused exhausted but 21 of their peremptory challenges, they accepted, “under protest, as it were,” jurors whom they would not have accepted but that they did not know who might afterwards be tendered; that the court had no right to order jurors to stand aside save for some good cause; and that the remark made by the court with reference to the juror, Murray, was calculated to prejudice the jurors impaneled. The judge gives the following reasons (stating them in substance) for the rulings complained of:
That Calcóte had married a cousin of the accused, and that sustaining the state’s challenge for cause on that ground was a proper exercise of judicial discretion; that Allen not only made it clear that he would not convict on circumstantial evidence, but that *834 the judge was aware that intimate family relations existed between him and the accused, and was convinced from his manner that he was not impartial, but was strongly prejudiced; that on' account of the nature of the crime there was widespread discussion in the neighborhood where it occurred, and for that reason the court ordered the sheriff to draw tales jurors from other parts of the parish, and that it was a most suspicious circumstance that Murray who was sent into court, not by the sheriff, but by the jailer, acting as his deputy, should have left his home, 30 miles away, where the relatives of the accused live, and should have been opportunely, in the neighborhood, so as to be summoned as a tales juror; that Gay stated on his voir dire that he had sympathy in the case; that he had several times visited parties in jail, and had made the acquaintance of the accused, and had discussed with them the facts of the case, and that it was considered better to obtain jurors without such sympathy.
We find no just cause of complaint in these rulings. The accused had no right to demand that they should be tried by the husbands of their cousins, the friends of their families, their immediate neighbors, persons whose sympathies they may have enlisted, or jurors who would be unwilling to convict them on legal evidence, and it was the prerogative, and the duty of the judge, if it was within his knowledge, or came to his knowledge, that for the reasons stated by him, or for any other reason, persons tendered for that service were not likely to make good and impartial jurors, to exclude them. But the legal situation would not have been different if he had erred, since it is settled that:
“The law gives to the accused the right to object to an obnoxious juror, but does not give him the right of selection. Hence the rejection of a juror by the judge, even if erroneous, affords no legal ground for complaint.” Act No. 135, p. 216, of 1898, § 1; State v. Breaux et al., 104 La. 541, 29 South. 222; State v. Kellogg, 104 La. 586, 29 South. 285; State v. Shields, 33 La. Ann. 1410; State v. Creech, 38 La. Ann. 481; State v. Carries, 39 La. Ann. 931, 3 South. 56; State v. Lewis, 41 La. Ann. 590, 16 South. 536; State v. Claire, 4l La. Ann. 1067, 6 South. 806; State v. Thomas, 41 La. Ann. 1088, 6 South. 803.
In the ease last mentioned it was said by this court:
“It is true that in excusing jurors a trial judge is bound to exercise a legal, and not an arbitrary, discretion, and that when he does excuse a juror for cause it is advisable for him to state his reasons for so doing; but it does not follow when he fails to do so that the accused who may have wished the juror to sit on his trial is entitled to complain so as to have, in case of his conviction, the verdict quashed * * *. It may occur that the trial judge * * * may have good reasons not to make his motives publicly known, and may take upon himself the responsibility of merely stating that he excused the juror in the exercise of a legal discretion for sufficient valid cause. Such reticence would not, in itself, be censurable here.” State v. Thomas, 44 La. Ann. 1089, 6 South. 804.
In State v. Claire, supra, it was held that .the possible error of the judge in refusing to allow the juror whom he had excluded to be cross-examined on his voir dire afforded no legal ground of complaint. Section 11, Act No. 135, p. 222, of 1898, in express terms, authorizes the trial judge to direct the summoning of talesmen “from any portion of the parish, remote from the scene of the crime, that he may designate.” And it has more than once been held by this court that the defendant in a criminal case is not entitled to service of the list of talesmen summoned to complete the panel. Knobloeh’s Cr. Dig. p. 276.
Bill No. 2 shows that Leon De Mourelle, a witness called by the state, testified in his direct examination:
“That, about two hours before the homicide, the buggies of the accused and the deceased collided in the street, near witness’ store; that witness heard part of the colloquy between the deceased and the accused, and heard the deceased say to the accused, ‘You have several times tried or attempted to kill me; do it now,’ or ‘why don’t you do it now,’ or words to that effect. Whereupon, on cross-examination, counsel for defendants asked the witness whether he knew, if the accused had previously made an *836 attempt on the life of the deceased, to which he answered, ‘No.’ He was then asked- whether he had ever heard of a previous attempt upon the life of the deceased -by the accused, which was objected to by the counsel representing the state, on the ground that an answer to the question would be hearsay. Counsel for defendants then announced that they expected to prove, not only by this witness, but, by every witness that the state might place on the stand, not only that said witness did not know of any previous attempt having been made by the defendants on the life of the deceased, but, that they had never heard of such an attempt, and contended that such proof was not hearsay but original testimony” etc.
And, the objection having been sustained, the bill was reserved. The ruling complained of was clearly correct. As appears from the statement per curiam, which forms part of this bill, the testimony given by the witness, on the direct examination, was admitted as showing something that was considered part of the res gestm, and immediately after the colloquy testified to, one of the accused went to his home and secured a pistol whilst the other obtained one from the town marshal and then jumped into a buggy with his co-defendant, who was driving in the direction of the home of the deceased, near which, the homicide, in which both defendants participated, occurred. No objection appears to have been made to the testimony given, and its admission without objection afforded no basis for the introduction of the testimony offered on behalf of the defendants, since, if the witness on the stand and others had testified that they had never heard of the attempt or attempts referred to, and still other witnesses had been called to testify that they had heard of such attempt or attempts, there would have been no light, legally thrown upon the subject, inasmuch as the whole mass of testimony would have been equally obnoxious to the objection that it was hearsay—not part of the res gestee—and therefore illegal.
Bill No. 3 shows that Jean Soileau, a witness. for the state, testified to a conversation which he had had with the defendant D. H. Thompson shortly before the homicide; that counsel for the state, for the purpose of refreshing his memory, attempted to read to him the transcribed testimony which he had given at the preliminary hearing some two months before, but was stopped by the objections that the state could not contradict its own witness; that the transcription in question could not be used because the writing had not been made contemporaneously with the conversation, and that the memory of the witness was as likely to have been at fault at the date of the preliminary examination as at the date of the trial; and the objections were sustained, but the court permitted the witness to read the transcribed testimony for himself, to which ruling a bill was reserved. It is enough to say of this bill that it appears from the statement per curiam, that the reading of the transcribed testimony did not refresh the memory of the witness, and that, after reading it, he testified that “he had no recollection of any fact about which he was then being interrogated.”
Bill No. 4 shows that the state offered what purported to be the transcribed testimony of O. A. Thompson, one of the- defendants, given at the preliminary examination, and taken down by an unsworn stenographer, and which had not been read to or signed by the witness after being transcribed; to which it was objected that the transcription was inadmissible “because not taken in conformity with section 1010 of the Revised Statutes of 1870, and the correctness of the same had not been established by the oath of any witness”; which objections were sustained. The bill further shows that the state then produced L. S. Childs, who was present when the testimony was given, and proposed to prove by him the substance thereof; to which it was objected that the testimony of Childs was not the best evidence; that the stenographer by whom the testimony of said Thompson had been taken down and transcribed was living in Crowley, and was accessible, and that *838 the notes of the stenographer, verified by her, constituted the best evidence of the testimony sought to be proved, which objections were overruled by the court upon the grounds that the transcribed testimony, having been excluded upon defendants’ objections, was out of the case, and that Childs who was present when the testimony was given- was called to prove voluntary statements and inculpatory admissions made by the defendant C. A. Thompson; that the stenographer by whom the testimony of Thompson had been taken down and transcribed had not been sworn and was not a resident of the parish; and that, whilst the instrument offered might have been the best evidence, it had been excluded for good reasons; and that as next best evidence the testimony of any reliable witness as to what the defendant had stated was as good as would have been the testimony of the stenographer.-
Section 1010, Rev. St. 1870, provides that in the preliminary examination, it shall be the duty of the magistrate “to receive the voluntary declaration of the person accused and the answers which, without promise or threat, he shall make to the questions which the examining judge or magistrate shall put to him, and cause them to be reduced to writing and signed by the prisoner, in his presence and that of two witnesses, or, if he cannot sign, to mention that circumstance and to •certify the declaration with his signature and that of two witnesses, which declaration, thus certified and signed, shall be evidence before the grand and petit jury.”
The instrument which is thus made “evidence before thp grand and .petit jury” is therefore the transcribed statement and answers of the person accused, signed by him in the presence of the magistrate and two witnesses, or, if he be unable to sign, with that circumstance mentioned, and the instrument certified by the magistrate with his signature and that of two witnesses. In the instrument offered none of those requirements were observed. It was therefore not “evidence,” and, for that reason, was inadmissible “before the * * * petit jury,” and would have been equally inadmissible if the stenographer had been present to verify her work, since her verification would not have supplied its deficiencies. That being the case, and it being virtually conceded by the bill and by the argument that the instrument offered represented the only attempt that was made to comply with the statute, and hence, that what might have been the best evidence of the facts sought to be proved had never existed, it follows that the state was at liberty to prove those facts by what would otherwise have been secondary evidence; i. e., evidence “such as presupposes or carries on its face an indication that there are more original sources of information, or that better evidence exists.” In regard to evidence of that character, the English rule has been, and perhaps is now, “that it has no degrees. A party entitled to resort to this mode of proof,” says an eminent English writer, “may use any form of it; his not adducing or even willfully withholding some other likely to prove more satisfactory is only a matter of observation for the jury.” Best’s Principles of Evidence (Chamberlayne’s Amer. Ed.) p. 452, par. 483. Prof. Elliott, in his recent work, says:
“The English rule is followed by a few American courts. The rule established and clearly deducible from the majority of American authorities, however, as to secondary evidence, is the same in effect as the rule between primary and secondary evidence; that is, that, when secondary .evidence is properly admissible, it must itself be the best that in the nature of the case can be produced, or the best kind of that character of evidence which appears to be within the power of the party to produce.” 2 Elliott on Evidence, p. 1265.
In the instant case the only possible evidence (in the absence of that contemplated by the statute) of what was stated and admitted by the defendant in his preliminary examination must consist of the testimony of the witnesses who heard him; and, as *840 between any two such witnesses, tbe law makes no choice, though possibly a witness who was present merely as an interested listener would be more likely to carry in his memory that which he heard than one who, whilst listening, was engaged in some mental and mechanical occupation. We therefore conclude that the testimony of Childs was properly admitted.
Bill No. 5, we are informed by the brief of counsel, is abandoned.
Bill No. 6 shows that Ademar Fontenot, a witness for the state, testified that he with several others, was about 200 yards away at the time of the homicide; that immediately thereafter he and the others went to the scene, all of them on foot except E. A. Soileau who was on horseback; that they all arrived about the same time; “that when he arrived he heard D. H. Thompson saying in French, ‘Je l’ai tué’; that that was all he heard him say, and did not know to whom the remark was addressed, if to anybody * * * ; that the witness and Soileau stayed where the accused was but a short time, and almost immediately went to where the deceased’s buggy was some distance off from the scene of the shooting,” etc. The defense, as the bill recites, contended that the accused, D. H Thompson, did not use the expression, “Jo Tai tué,” but, in answer to a question from E. A. Soileau as to what was the matter in French; that is, “Qu est-ee qu’il y a?” answered, “Le Doeteur a tiré Chester et moi, et moi, je l’ai tiré” and, at the proper time, Soileau was called as a witness for the defense, and was asked to state what Thompson had told him when he and Fontenot and the others arrived, which was objected to, and the jury was thereupon retired, and the testimony of Soileau having been taken, the objection of the state that the Statement of Thompson, as testified to by Soileau, was a self-serving one, not connected with that testified to by Fontenot, was sustained, whereupon defendants reserved their bill and made the testimony of Soileau part of the same. That testimony is here reproduced as follows:
“By the court: Q. Did you and Ademar Fontenot go to where the Thompsons were, together? A. I was on horseback and he was on-foot, and I did not notice if we arrived together or not. Q. Were you ahead of him, ox-he ahead of you? A. I ought to have been ahead of him, because I was on horseback and he on foot. Q. Were you both there when Buddy Thompson first spoke in French? A. I do-not know if Ademar was there when he first spoke to me in French. Q. Can you say if you got to where the Thompsons were ahead of Ademar or not? A. I cannot say. Q. Did you hear Thompson speak before you got there? A. No. sir. Q. When you arrived there, were you the first pei'son he spoke to in French? A. I was-the first person he spoke to in French. Q. Was all of his conversation in French spoken in your presence? A. I heard all that he said’ in French while I was there. Q. Did you hear-him use the expression, while talking in French, ‘Je l’ai tué’? A. No, sir. Q. What did you hear him say in French? A. Buddy said to me-in French, in answer to my question, in French, ‘Qu’ est-ce qu’il y a?’ ‘Le Doeteur a tiré Chester et moi, et moi. Je l’ai tiré’. Q. Can-you say tliat at any time while Buddy Thompson was talking French to you, or to any others at that time, he did not use the expression, ‘Jel’ai tué’? A. He did not use that expression in my presence. Q. You arrived there about the same time that Ademar Fontenot did, as I understand, did you remain there after your arrival and hear all that Buddy Thompson said' in French and in English? A. No, sir; I cannot say that I staid long enough to hear all that he said. Q. Did you stay long enough to hear that he said in French? A. Yes; I stayed long enough to hear all that he said in French. Q. If Buddy Thompson, during the time that he was talking French on that occasion, had used the expression, ‘Je l’ai tué,” loud enough for Ademar Fontenot to hear it, would you also have heard it? Yes, I should have heard it. (By the district attorney) Q. Do you know whether he used the expression‘Je i’ai tué,’ before you started any conversation with him at all? A. I never heard that. Q. Do you say that he never said, that, or,, that you never heard that? A. He never said that in my presence. Q. Do you know what he said, if anything, while you were coming up-before you said anything to him? A. No, sir. Q. What he said to you in French was in response to a question to him by you? A. Yes, sir. Q. Then, if he said anything before you asked him the question in French ‘What’s the matter,’ you never heard it? A. 'No; I don’t suppose I had arrived. [By Mr. Yeazie] Q. Then, if the accused Buddy Thompson did say, *842 ‘Je l’ai tué,’ as stated by Ademar Fontenot, :and you did not hear it, then it could not have been said at the time and in the same connection as the statement you heard him make? A. No; if he said that, it could not have been at the same time or I would have heard it. [By the district attorney] Q. If he used the ■expression, it was not in any conversation with you? A. No, sir. [By Mr. Dubuisson] Q. Nor was it in your presence? A. No, not in my presence. [By Mr. Lewis] Q. Were you not the first man who reached the place? A. Yes, sir; one of the first. Q. Did you stay there until the entire party left for town? A. No, sir. [By Mr. Dubuisson] Q. Who left Buddy Thompson first, you or Ademar? A. I cannot say. Q. When the pistol was found in the lane were not you and Ademar together? A. Yes, ■sir. Q. Was not that immediately after the conversation between you and Buddy Thompson, ■as above? A. Yes, sir.”
The judge gives his reasons for his ruling, in part, as follows:
“That the witness Ademar Fontenot testified that when going to the scene of the shooting he heard the defendant Thompson, say in a loud voice, ‘Je l’ai tué,’ that he heard him say nothing else before or after that remark was made, and that he heard no one ask him any question. The court permitted the defendants to show by any and all evidence in their ■possession that the defendant D. H. Thompson did not make the remark attributed to him by Ademar Fontenot. But the defendants, claiming that this statement of D. H. Thompson, being part and not the whole of the statement made by him at the time, offered or tendered the witness E. A. Soileau to show that fact, thereupon the court ordered the jury to retire and took out of their presence the testimony ■of the said Soileau, which is attached hereto; and upon examination bjr the court of said testimony, it was ascertained that the statement testified to by Ademar Fontenot was not part of the conversation detailed by the witness E. A. Soileau, and therefore excluded the declaration made by the defendant D. H. Thompson to the witness E. A. Soileau, on the ground that it was a self-serving declaration. It was apparent to the court that this was a disguised attempt on the part of the defendants to introduce before the jury the following self-serving declaration to a bystander, after the homicide had occurred, to wit: ‘Le Docteur a tiré Chester et moi, et moi, Je l’ai tiré.’ But unfortunately for them, their witness failed to connect the statement tesified to by Ademar Fontenot with the declaration made to E. A. Soileau.”
It will be observed, from the statement of the judge that the exclamation testified to by Fontenot was heard as that witness was approaching the scene, that it was made in a loud voice, and that it was disconnected from any other remark, and that, upon the other hand, Soileau testifies that what he heard was said after he arrived on the scene, and was in response to his question, “Qu estce qu’il y a”? It will also be observed that Soileau does not know whether he and Fontenot arrived at the same time; that he testifies that if the defendant made the exclamation attributed to him by Fontenot, it must have been before he (the witness) arrived; and that such an exclamation could not have been made when the defendant was talking to the witness, or he (witness) would have heard it. It was not asserted that the conversation testified to as having taken place between Soileau and defendant was part of the res gestse. It is, no doubt,- the rule that:
“Where a witness testifies to a part of a statement of a party as an admission, the party is entitled, on cross-examination, or redirect, of the same witness, or by other witnesses, to show the entire statement made at the same time, provided the part -which he thus proves relates to the subject-matter of the admission in evidence, and tends to explain or qualify it. It is generally held that where part of a conversation * * * is introduced by one party, as an admission, the other party is not entitled to the remainder, on his own behalf, unless it relates to the subject-matter of the admission, and explains or modifies the same, nor can he introduce his own self-serving statements, made on another and separate occasion.” (Italics by present writer). 16 Cyc. 1039-40.
It is evident from the testimony of Soileau that the exclamation attributed to the defendant by Fontenot was not made upon the occasion of, or in connection with, the conversation to which Soileau testifies, and therefore furnished no basis for the introduction in evidence of that conversation. State v. Gunter, 30 La. Ann. 536; State v. Rutledge, 37 La. Ann. 378; State v. Jones, 47 La. Ann. 1524, 18 South. 515; Knoblock’s Or. Dig. pp. 165, 171. Whether the exclamation was made at all, and whether the conversation took place at all, and whether the witnesses, respectively, could have heard the *844 one without hearing the other, were questions for the jury.
Bill No. 7 shows that defendants, without having called the defendant D. H. Thompson to the stand as a witness, announced “that they had closed their case in chief,” whereupon the court inquired of counsel for the state, what was their pleasure, to which one of the counsel, who was assisting the district attorney, replied in a loud and distinct tone of voice, that he could not say, as that officer had left the courtroom to telephone to his home, under the impression that counsel for the defendants would place the other defendant, meaning D. EL Thompson, on the stand to testify; that this statement was made in the hearing of the jury, and was objected to by counsel for the defendants, .and that the court took no action in the matter, “but simply charged generally in the general charge by reading Act No. 41, p. 77, of 1904, to the jury, and explaining to them the meaning of said act, without re-referring, in terms, to the remark of counsel for the state, * * * to which remark of counsel for the state and the action of the court thereon, counsel for defendants excepted,” etc.
The judge’s reasons for his action are in part as follows, to wit:
“This matter was nothing more than a conversation between the court and counsel, necessary to carry on the business of the court, and to explain a seemingly unnecessary delay in the trial. No attempt was made by either court or counsel to draw any inference, favorable or unfavorable, from the fact that defendant, up to that time, had not testified. The remark was not made in a loud voice, or made with any apparent attempt to draw the attention of the jury to a fact patent to them. * * * It is impossible for any judge to prevent such occurrences as this during the progress of a trial, and when happening to say that because it may or is calculated to prejudice the jury, and, therefore, a new trial should be granted, is practically to say that the jury, have violated their oaths of office, and have acted in flagrant disregard of the charge of tha court; and all this merely upon the supposition that they have been influenced by preju dice.”
Act No. 41, p. 77, of 1904, after declaring-that the accused may testify, subject to the-rules applicable to other witnesses, provides-“that his failure to testify shall not be considered for or against him,” and this, as we understand from the bill, was read and explained to the jury, which (the remark complained of having been made without intention, and not by way of comment, but as a natural answer to a natural question) was sufficient to meet the requirements of the situation.
We find no error in the rulings of the trial judge, and the verdict and sentence appealed from are affirmed.