(69 South. 808)

No. 21175.

STATE v. LEBLEU et al.

(June 7, 1915. On Rehearing, Oct. 18, 1915.)

*(Syllabus by the Court.)*

1. CRIMINAL LAW ⬤═917 — NEW TRIAL — GROUNDS — DENIAL OF CONTINUANCE — ABSENT WITNESS.

Where, in a motion for continuance on account of the absence of a witness, a defendant, charged with larceny, alleged that he expected to prove by the witness a fact which, if established, would have been of vital importance, as constituting an alibi, and also that he had another witness by whom he might be able to prove the same fact, and, the continuance having been refused and the witness who was present having failed to testify as expected, the defendant was convicted, and thereafter moved for a new trial, but failed to attach to his motion the affidavit of the absent witness, to the effect that he would have testified as expected, and failed, upon the hearing of the motion, to produce such witness, or to account for his absence, the conviction will not be set aside, on account of the refusal of the trial court to grant the continuance; the presumption, in default of any explanation, being that the witness would not have testified as alleged in the motion for continuance, and hence that defendant suffered no prejudice from his absence.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 2161, 2162; Dec. Dig. ⬤═917.]

2. WITNESSES ⬤═330—CROSS-EXAMINATION— DISCRETION — FOUNDATION FOR IMPEACHMENT.

The extent to which cross-examination, upon collateral matters and immaterial issues, may be carried, with the view of testing the credibility of a witness, is within the discretion of the trial court, though the propounding of questions with a view of laying the foundation for the impeachment of a witness is a matter of right.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 1106–1108; Dec. Dig. ⬤═330.]

3. INDICTMENT AND INFORMATION ⬤═160 — AMENDMENT—CONFORMING TO PROOF.

Where there is a variance between the testimony, describing the brand of cattle alleged to have been stolen, and the description as given in the bill of indictment, the bill may be amended to conform to the testimony.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 515; Dec. Dig. ⬤═160.]

4. LARCENY ⬤═31 — STEALING OF CATTLE — INDICTMENT—ALLEGATION OF VALUE.

The stealing of cattle is a felony, without regard to value, and the value need not be alleged in the indictment.

[Ed. Note.—For other cases, see Larceny, Cent. Dig. §§ 76–80; Dec. Dig. ⬤═31.]

5. CRIMINAL LAW ⬤═508—WITNESSES ⬤═88 —COMPETENCY—ACCUSED.

Under the law as it now stands, a defendant in a criminal prosecution is a competent witness, and his testimony is admissible not only in his own behalf, but for or against his codefendant, with whom he is being jointly tried.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1099–1123; Dec. Dig. ⬤═508; Witnesses, Cent. Dig. §§ 243, 244; Dec. Dig. ⬤═88.]

6. CRIMINAL LAW ⬤═686—ORDER OF PROOF —DISCRETION.

In a case where several defendants, being charged with conspiracy to steal and stealing, are prosecuted jointly, the state rests, and one of the defendants closes, without offering evidence, and another then offers evidence in his own behalf and tending to incriminate his codefendant, first mentioned, the objection of the latter that, the state having closed, and he having offered no evidence to be rebutted, no further evidence against him was admissible, was properly overruled. It was within the discretion of the trial judge to admit any competent evidence, at any stage of the trial, if necessary to further the ends of justice.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1619, 1620, 1625, 1626; Dec. Dig. ⬤═686.]

7. CRIMINAL LAW ⬤═649 — JURY ⬤═72 — TALES JURORS—DETERMINATION OF NUMBER —DELAY OF TRIAL—DISCRETION.

It is within the discretion of the trial judge to determine how many tales jurors shall be ordered for a particular occasion, and equally within his discretion to determine whether a case on trial shall be delayed until the whole number ordered shall have reported or been accounted for, or whether the jury for such case shall be completed from the tales jurors who

may have appeared when the court is ready to proceed with its business.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1512–1515; Dec. Dig. ☞ 649; Jury, Cent. Dig. §§ 333–347; Dec. Dig. ☞72.]

8. CONSPIRACY ☞45 — CRIMINAL LAW ☞ 417, 427—EVIDENCE—ADMISSIBILITY—ORDER OF PROOF.

Where several persons are prosecuted jointly upon a charge of conspiring to steal and stealing cattle, and it appears that the sheriff and his deputy had visited the pasture of one, and there found another, the hired man of the first, engaged in skinning one of the stolen cattle; that the skinner said to his wife, "They have got me; let him know, right away;" that a boy was started, on the run, to the house of the first mentioned defendant, and, passing the sheriff and his deputy en route, entered the house; that, upon being interrogated, he said that he had delivered a note, sent by the wife of the second mentioned defendant to the first mentioned; that the first mentioned defendant, upon being interrogated within a few minutes, admitted that the boy had delivered the note, "in front of him, but he didn't see it, didn't know what became of it, didn't look at it;" and, on being asked to show it, said that "he didn't know what became of it"—the testimony of the sheriff and his deputy to those facts was properly admitted, as tending to show conspiracy between the two parties defendant, and directly to connect them with the stealing of the cattle, and (save, perhaps, the statement of the boy) was not obnoxious to the objection that the doings of third persons, not charged with the conspiracy, or the larceny, were being brought into the matter; the wife and the boy having been merely the instruments used by the others in the conduct of their operations. "Where the conspiracy is to be established by inference, drawn from a number of facts and circumstances, the order of proof is discretionary with the court, and evidence of the acts and declarations of the supposed conspirators may be admitted at any time, dependent, for effect, under the charge of the judge, upon the ultimate establishment of the conspiracy, and of the accused's connection therewith, to the satisfaction of the jury."

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 100–104; Dec. Dig. ☞45; Criminal Law, Cent. Dig. §§ 950–967, 1012–1017; Dec. Dig. ☞417, 427.]

9. CRIMINAL LAW ☞413—EVIDENCE—SELF-SERVING DECLARATION.

A statement, said to have been made by a defendant, prosecuted jointly with others, for an alleged conspiracy to steal and stealing cattle, to his hired man, similarly prosecuted, which concerned the acquisition of the cattle, but was not part of the res gestæ, and was not made by way of explanation, to a person to whom an ex-planation was due, of his possession of the cattle, was properly excluded, as self-serving.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 928–935; Dec. Dig. ☞413.]

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Winston Overton, Judge.

Artemo Lebleu and another were convicted of stealing cattle, and appeal. Affirmed.

A. R. Mitchell, of Lake Charles (W. B. Williamson, of Lake Charles, of counsel), for appellant Lebleu. Robert R. Stone, of Lake Charles, for appellant Williams. R. G. Pleasant, Atty. Gen., Thos. Arthur Edwards, Dist. Atty., of Lake Charles, and J. H. Jackson, Asst. Dist. Atty., of De Ridder (G. A. Gondran, of New Orleans, of counsel), for the State.

MONROE, C. J. Artemo Lebleu, Wade Lebleu, James Lebleu, George Williams, Ed. Williams, and Ursin Moore were indicted, jointly, for stealing seven duly described cows, "the property of various owners." Artemo Lebleu and George Williams were convicted and sentenced, and they have appealed; the prosecution as to Wade Lebleu was abandoned; the other defendants were acquitted.

We shall first consider, seriatim, the bills of exception reserved on behalf of the appellant Artemo Lebleu, to wit:

[1] 1. A bill to the refusal of the court to grant a continuance, on account of the absence of Henry Hébert, Volma Lebleu, and John Strotter, three witnesses who had been duly summoned, but failed to appear. The complaint, as now urged, relates exclusively to Henry Hébert. The motion for continuance, attached to the bill, reads in part as follows:

"(1) That he [defendant] cannot go safely to trial herein, at this time, because of the absence of three of his competent, material, and important witnesses, to wit: Henry Hébert. * * *

"(2) He shows that he expects to prove by Henry Hébert that he (Dock Lebleu) stayed at

the home of Henry Hébert on the night of October 8, 1914."

Then follows a statement of the other facts which he alleges that he expects to prove by John Strotter.

"(4) Now your petitioner shows that, while there are other witnesses by whom he might prove these facts, but that he does not positively know that he can do so, but he does know that he can establish those facts by the witnesses herein mentioned. He shows that the witnesses above mentioned have been duly subpoenaed, that their failure to respond is not due to any procurement or effort on the part of your appearer, and that he cannot go safely to trial, at this time, because of their absence."

Then follows a statement of certain facts, which he alleges that he expects to prove by Volma Lebleu.

"(6) He further shows that he knows of no other witnesses by whom he can prove those facts, and that the said witnesses are competent, material, and important in his behalf.

"(7) He shows that he used all due diligence to obtain the presence of the above-named witnesses before your honorable court at this time, but without avail; but he shows that he verily believes that he can and will secure their presence before your honorable court at a later date, and therefore moves your honor that this case be temporarily postponed until such time as he may be able to secure their attendance.

"(8) He shows that he has given ample bond for his appearance, and that, in the event that he can obtain the presence of these witnesses, he is prepared for trial."

The learned judge a quo attaches to the bill the following statement (quoting in part), to wit:

"As relates to the absence of Henry Hébert, it will be noted that the application for a continuance is vague, in that (it reads), 'while there are other witnesses by whom he might prove these facts, but he does not positively know that he can establish these facts by the witnesses herein mentioned;' and again, further on in the motion, he says that he knows of no other witnesses by whom he can prove them. Under the circumstances, during the argument of the motion for continuance, the court asked Mr. Mitchell, of counsel for Artemo Lebleu, if he could prove by any other witnesses what he expected to prove by the absent witness, Henry Hébert, and the answer was that he expected to prove the same facts by Poly Hébert, who was present in court. This verbal reply is indicated in the motion for new trial, upon which point the court was also asked to grant a new trial, for, by reference to it, it will be seen that it sets out that, while 'he had one other witness by whom he expected to prove this fact,' that witness, who testified on the trial, was unable to fix the date of appearer's presence at the house of Henry Hébert, as could have been done by Henry Hébert himself. Hence, because of the verbal reply given, and because the motion for continuance was vague, the court was influenced to overrule the motion for a continuance, in so far as the absence of Henry Hébert was concerned, because of whose absence alone this bill is presented. Upon the showing made, a continuance should not have been granted, and also in view of the fact that there were a large number of witnesses in the case, which lessened the probability of ever securing the presence of all, and likewise in view of the fact that one continuance had been granted, at the instance of Artemo Lebleu, several weeks before, because of his having been sick with a painful eye. In the argument of a motion for a rehearing, the district attorney stated, relative to the absence of this witness, that, in addition, he had stated, at the time the motion for continuance was being heard, that, in the event that there was a failure to show, by any other witness, what this witness was expected to testify to, he would admit that, if the witness were present, he would testify as set out in the motion. Mr. Mitchell, leading counsel for the defendant, in response to a question by the court, stated that this was correct. Poly Hébert failed to fix the date in October. The accused, however, testified to it. No effort was made to read the admission to the jury. While the court does not propose to question the statement of the district attorney, nor of Mr. Mitchell, and while a statement on this order was unquestionably made, at the time of the hearing of the motion, yet the court feels that it ought to say that it has some slight misgivings as to the correctness of the memory of both on this point, due to the fact that, because of the verbal statement, made at the time, that defendant had one witness present by whom he expected to prove the same thing, which statement was unquestionably made, there would seem to have been no adequate necessity for the application of it to the absence of Henry Hébert; whereas, it might possibly have applied to the absence of the two other witnesses mentioned in the motion for continuance, and whose absence is no longer complained of. The court, however, thinks that, assuming [the word in the text is "answering"] that the above misgivings are well founded, there were ample grounds for refusing the continuance, and likewise no good reason for granting the new trial, which was also asked for on the bill. It ought to be remembered that this bill was not presented till about three weeks after the continuance had been refused."

The rule of the court in regard to the presentation of bills of exception is then reproduced, with minute entries showing that delay had been granted in this case, and the statement of the court proceeds:

"The court, because Mr. Mitchell has notified it, in presenting the bill, that he was sick at least part of the time, and because it has signed other bills in other cases, when presented two or three days late, signs the present one."

It will be observed that the motion for continuance contains the following, to wit:

"While there are other witnesses by whom he might prove those facts, but that he does not positively know that he can do so, *but he does know that he can establish those facts by the witnesses herein* mentioned," etc.

Whereas, in the statement per curiam it is said:

"As relates to the absence of Henry Hébert, it will be noted that the application for a continuance is vague, in that (it reads), 'while there are other witnesses by whom he might prove those facts, *but he does not positively know that he can establish those facts by the witnesses herein mentioned.*'" (Italics by the writer of this opinion.)

No one can be more careful, thorough, and conscientious than our brother of the district court, and it may be that the discrepancy between the text of the motion as it appears therein, and as it appears in his statement of it, is due to the fault of the copyist by whom the transcript was prepared; but we must take the transcript as we find it, and, so taking it, are bound to assume that our learned brother fell into the error of believing that defendant had alleged that "he does [did] not positively know that he can [could] establish those facts" by Henry Hébert and other witnesses; whereas, defendant had really alleged that "he does [did] know that he can [could] establish those facts by the witnesses mentioned"—which error may well have created the impression of vagueness (in the motion for continuance) to which the statement per curiam refers; since it appears to us reasonably clear that the mover intended to say that while there were other witnesses by whom he might prove those facts, he did not positively know that he could do so, and hence considered it necessary that he should be afforded the opportunity of securing the presence and testimony of the witnesses on account of whose absence the continuance was asked. Upon the face of this bill, considered alone, we should therefore be disposed to think that defendant was prejudiced by the ruling of which he complains; but we must consider the whole case as he presents it, and, so doing, we find that, notwithstanding the vital importance of the alibi, which, in his motion for continuance, he alleged that he knew he could establish by Henry Hébert, he failed to attach to his motion for a new trial, in which the allegations of the motion for continuance were repeated, any affidavit from Hébert in support of those allegations, and failed to produce Hébert as a witness in their support, upon the hearing of the motion for new trial, or to account for not doing so, from which failure the inference appears inevitable that he found himself disappointed in the testimony that Henry Hébert would have been able to give, as he had been in that which Poly Hébert had been able to give, and hence that his failure to obtain that testimony did not operate to his prejudice.

[2] II. One of the persons whose cattle was said to have been stolen, having been examined as a witness for the state, was asked, on cross-examination, "Are you assessed with the cattle which you claim were stolen from you?" and the question was objected to, as immaterial and irrelevant, and the court sustained the objection, and ordered "that further questions along those lines be not asked," though the announcement was made that the question was asked for the purpose of testing the credibility of the witness. In ruling upon the point, the court said:

"As declared, the purpose of the question was to test the credibility of the witness. The credibility of a witness cannot be impeached by particular acts, irrelevant to the issue and sought to be brought out on cross-examination for the purpose of impeaching him."

It is no doubt well settled that questions concerning facts that are irrelevant to the

issue before the court are properly excluded, when asked merely with a view of thereafter showing that the answers are untrue; but there is a difference between testing the credibility of a witness by legitimate cross-examination, and the asking of questions upon irrelevant matters as laying the foundation for impeachment.

In the case last mentioned, the questions may be asked as of right; whereas—

"the extent to which a cross-examination relating to collateral matters and immaterial issues may be carried is within the discretion of the court, and its holding is not the subject of review unless there is an abuse of discretion." Knobloch's Cr. Dig. pp. 429, 430, and authorities there cited.

We discover no abuse of discretion in this instance.

[3] III. One of the persons who are named in the indictment as the owner of some of the stolen cattle testified that the brand set forth in the indictment as his was not his brand, and the district attorney was permitted to amend the indictment, so as correctly to describe the brand of the witness, over defendant's objections that he had been called to answer with respect to a particular brand, that a number of witnesses had already been examined, and that he had objected to the admission of any evidence, upon the ground that no value had been alleged.

The judge states that the difference between the brand testified to and that alleged was very slight. "As shown in the indictment, one line slightly intersected another, whereas it should have merely joined it." The amendment was authorized under R. S. § 1047. State v. Jacobs, 50 La. Ann. 447, 23 South. 608.

[4] The objection that no value had been alleged was properly overruled, since the stealing of cattle is a felony, without regard to value. Act 64 of 1910, p. 109; State v. Hickman, 127 La. 442, 53 South. 680.

[5] IV. Ursin Moore having been called to the stand as a witness for the state, the objection was made that, as one of the alleged co-conspirators, he should not be permitted to testify as against his codefendants and alleged co-conspirators, inasmuch as the conspiracy had not been established, but that his testimony should be received as against himself alone.

The common-law rule concerning the competency, as witnesses, of codefendants in criminal prosecutions, has been abrogated in this state by statute. Act 29 of 1886 provided:

"Section 1. * * * That the competent witness in all criminal matters shall be a person of proper understanding. * * *

"Sec. 2. * * * The circumstance of the witness being a party accused shall, in no wise, disqualify him from testifying. * * *"

And there are some other provisions which are omitted as being irrelevant here.

The construction placed upon that act by this court was that, although it made a defendant in a criminal case a competent witness in his own behalf, it did not qualify him to testify for or against a codefendant, on trial with him under the same charge. Such was the ruling in State v. Sims and Mays, 106 La. 453, 31 South. 71 (decided during the term of court ending June 30, 1902). Immediately thereafter (that is to say, on July 10, 1902), the Governor approved the Act No. 185 of the session of that year, amending and re-enacting the act of 1886, and reading (omitting matter that is irrelevant here) as follows, to wit:

"Section 1. * * * That the competent witnesses in all criminal matters shall be a person of proper understanding. * * *

"Sec. 2. * * * That the circumstance of the witness being a party accused, or being jointly tried, shall, in no wise, disqualify him from testifying," etc.

And there was a further amendment and re-enactment, by Act 41 of 1904, for the sole purpose, apparently, of making some change with reference to the testimony of married persons. Inasmuch, therefore, as the decision in State v. Sims and Mays, supra, and

other cases therein cited, left no doubt that, under the act of 1886, a defendant in a criminal prosecution was a competent witness in his own behalf, with privilege, if he chose, of confessing his guilt, even though on trial jointly with another, charged with the same offense, and, inasmuch as his testimony for or against such other defendant was held to be inadmissible, it is clear that the only purpose of the act of 1902 was to place it equally beyond doubt that such defendant should be a competent witness for or against a codefendant with whom he is "being jointly tried."

In some other jurisdictions the act of 1886 would, of itself, have made a person of proper understanding a competent witness for or against a codefendant, as well as for or against himself. 20 Cyc. 450, note 1. But, as this court had held otherwise, it appeared necessary to pass the act of 1902, and expressly declare that:

"The circumstance of the witness being the party accused, *or being jointly tried, shall, in no wise, disqualify him from testifying*" in all criminal matters.

In the monograph, entitled "Witnesses," in 40 Cyc., the learned author, after dealing at considerable length with the subject of the disqualification of witnesses, under the common law, from interest, says:

"The common-law doctrine of incompetency arising from interest has been stated in outline merely, without any attempt to give a complete treatment, for the reason that it is of no practical importance at the present time, as, in England, Canada, and every state and territory in the United States, except Porto Rico, the common-law rule has been abrogated by statute. The modern statutory rule is that parties to, and persons interested in the event of, a civil action are perfectly competent as witnesses therein, notwithstanding their interest, and the same rule applies in criminal proceedings; even a defendant on trial being allowed to testify in his own behalf, if he so desires."

And many authorities are cited, including the Act 185 of 1902, to which we have referred. 40 Cyc. 2256.

As to the objection that the testimony of the witness Moore was not admissible, because the conspiracy had not been established, the learned trial judge states that that testimony was of such a character that its admissibilty was not dependent upon the establishment of the conspiracy, that it might have tended to establish it, and, if believed, did tend, directly to connect the defendant with the offense charged.

[6] V. It appears from bill No. 5 that, the state having rested its case, the defendant Lebleu announced that he also rested; that thereupon the defendant George Williams called a witness to the stand, and that the defendant Lebleu objected to any testimony that he, or any other witness, might give, tending to connect him (Lebleu) with the offense charged, on the grounds, in effect, that defendants were prosecuted as parties to an alleged conspiracy, but that the state "had closed and rested" without establishing the conspiracy or making prima facie proof thereof; and that, he (Lebleu) having offered no evidence, and there being nothing to rebut, he was entitled to have the case, as to him, submitted to the jury as it stood, and that any statement, in confession, which the witness then on the stand might make, would implicate him alone, and, if admitted at all, should be admitted only as against himself.

The statement per curiam, incorporated in the bill, is to the effect that defendant, when making his objection, did not know whether any attempt to prove a confession would be made, and that, in point of fact, no such attempt was made; that, as to the objection first stated, when the state closed, it had proved, among other things, that the cattle had been stolen, and were, soon afterwards, found in the possession of George Williams, and had produced some evidence against Artemo Lebleu; that the theory of the prosecution was that there was a conspiracy to steal cattle, which culminated in the theft charged in the indictment; that George

Williams, a butcher, received the cattle from Lebleu, and paid, or agreed to pay, something for them, but that it was, in effect, a division of the booty, and that Williams was not merely a recipient of stolen property, knowing that it had been stolen, but was a party, with the other defendants, to the conspiracy to steal it; that, the state having announced that it expected to prove the conspiracy by a number of independent circumstances, the court, in the exercise of its discretion, left the question of conspiracy, vel non entirely to the jury—giving proper instructions, on several occasions during the trial, and fully in the charge—and at no time during the trial passing upon the question whether the state had made prima facie proof of a conspiracy, but in admitting acts and declarations of one defendant, in furtherance of the alleged conspiracy, done or made out of the presence of the others, limiting them to that one, with instructions to the jury not to consider them as against the others, unless they should find that the alleged conspiracy was proved, and in the charge repeating those instructions, telling them not to consider such acts or declarations against another, unless they could say, from the evidence, that the one doing or making them was, as it were, the agent of that other in accomplishing the object of the conspiracy, if they found one; that the act of 1904 calls for the interpretation that the common-law disqualifications have been removed, and that one accused person can take the stand on behalf of his codefendants, or, being jointly tried, can be placed upon the stand by the state, with his permission; and, if that be so, there is no reason why, if, while testifying in his own behalf, he should give evidence incriminating his codefendants, that evidence should not be considered against such codefendants. The judge quotes from Smith v. People, 115 Ill. 17, 3 N. E. 733, and cites Richards v. State, 91

Tenn. 723, 20 S. W. 533, 30 Am. St. Rep. 907, and Com. v. Brown, 130 Mass. 279 (as cited in Abbott's Trial Briefs, 279), to the effect that:

"When one of several defendants, on trial together, voluntarily becomes a witness, he is a witness for all purposes. If he knows facts injurious to a codefendant, they may be brought out, either by his own counsel or the state"

—it having been held in the case last mentioned, where there was a joint trial of two, and the prosecution had rested, that the testimony of one of them, given in his own behalf, was admissible against the other.

"In my view," continues the learned judge, "these authorities, and I know of no others, unless the Sims Case [referring to the case of State v. Sims and Mays, 106 La. 453, 31 South. 71], cited in the beginning, is still applicable, notwithstanding the change in the statute, support, not only the view that a codefendant's evidence should be received against his codefendant, but likewise, that of his witnesses. The only difference between those cases and this one is that Artemo Lebleu had closed. He had the right to close; but, in doing so, he did not have the right to cut off the effect of his codefendant's evidence, which right, subject to his bill, he exercised. I am not of the opinion, as contended, that this ruling violates the fundamental principle that the burden is upon the state to show guilt beyond a reasonable doubt, and that this burden remains upon the state throughout the trial. That burden is discharged whenever guilt so appears, taking the case as a whole. If it should be that the evidence of a defendant, in connection with that of the state, makes it appear, that is enough. The state pays the penalty when it fails to appear, for it bears the burden. The sole purpose of the trial is to ascertain the truth of a fact at issue, and no construction of law should be indulged in, when it can reasonably be avoided, which would defeat that purpose or tend to do so."

The bill here in question appears to have been presented for signature some time after it was reserved, a circumstance which we now note, as accounting for the following, included in the statement of the judge, to wit:

"George Williams himself, during the trial, took the witness stand, in his own behalf, and introduced several witnesses—his purpose being to show how, and from whom, he got possession of the cattle, and that he was no party to a conspiracy to steal cattle, and which resulted in the stealing of these, but that he came by them honestly, in the regular course of business. George Williams testified that he bought the

cattle from Artemo Lebleu in good faith, and in the regular course of business, and the evidence of some of his witnesses tended to connect Artemo Lebleu with the delivery of cattle to him. * * * *

"This bill is intended to include the fact that George Williams took the stand in his own behalf, and at which time he was jointly on trial with Artemo Lebleu and others, and, of course, before the same jury, as well as the fact that the court refused to restrict the evidence of Williams and some of his witnesses so as to exclude Lebleu, merely because the state had announced that it rested, and Artemo Lebleu had stated that he closed."

As will be seen from the foregoing, the bill presents no question of the admissibility vel non of statements, or confessions, of alleged conspirators, made out of the presence of each other, since it is based upon a ruling concerning testimony which had not then been offered, and it does not, and could not, appear from the bill that any testimony of the character mentioned was afterwards offered. The ruling objected to, in so far as it holds that one defendant is a competent witness for or against another, with whom he is being jointly tried, has already been found, in our consideration of bill 4, to be correct. The only remaining question, presented by this bill, then, is whether such testimony, or any testimony, is admissible as against one of the joint defendants, who, after the state had rested, has closed, when offered on behalf of another of the joint defendants, or the state; and that question, we think, has been correctly answered by the trial judge. In the case of Com. v. Brown, 130 Mass. 279, to which he refers, it appears (from the opinion as reproduced in the brief for the state) that Brown and Gilman, and perhaps others, were charged with having in possession certain burglars' tools, "with intent," etc.; that, after the state had rested its case, Gilman became a witness in his own behalf, and denying any other knowledge of the tools, testified, on cross-examination, that while in the dock, on the morning after the arrest, and at another time, Brown had told

him that he had "brought them to the house" and was going to claim them, to which testimony Brown objected, in so far as it affected him, whereupon the court ruled that:

"Gilman having offered himself as a witness, his testimony was competent for and against the other defendant, as well as himself [citing authority]," and that "the court might permit the commonwealth to introduce any competent evidence, at any stage of the trial, even after it had once rested its case [citing Commonwealth v. Blair, 126 Mass. 40]."

Upon the question whether it is within the discretion of the trial judge to admit such testimony as was here objected to under the circumstances and conditions which have been stated, this court has ruled in the following cases and others, to wit:

In State v. Rose, 33 La. Ann. 933, the defendant being prosecuted for "shooting at with intent to commit murder, the state, after examining several witnesses, rested its case, whereupon the defendant declined to offer any evidence (as did the defendant here), and the state then called other witnesses, whose testimony was objected to, upon the grounds (here relied on) that the state had closed and that no matter for rebuttal had been introduced, but it was held that:

"The judge, at the trial, has discretion as to the admission of evidence, out of the regular and usual course, and must exercise such discretion when necessary to promote justice [citing Wharton's Crim. Law, §§ 3009, 3342; State v. Coleman, 27 La. Ann. 694; State v. Colbert, 29 La. Ann. 716; State v. Woods, 31 La. Ann. 268."

To which we may add State v. Gaubert, 49 La. Ann. 1694, 22 South. 930.

We therefore, conclude that the objections noted in this bill were properly overruled.

[7] VI. The statement per curiam attached to bill No. 7 (which differs somewhat from the recitals contained in the body of the bill) reads in part:

"At noon, the regular panel having already been exhausted and such tales jurors as had already been drawn from the tales jury box, the court ordered the clerk to draw from the tales jury box, in open court, the names of 50 addi-

tional tales jurors, and ordered the sheriff to summon them. * * * When the court reconvened, after the noon meal, there were present in the courthouse 30-odd of the 50. At this time there were 5 jurors in the jury box, accepted and sworn in the case. There was, therefore reasonable prospect of securing the remainder of the jury from the 30-odd present."

The judge then quotes from the stenographer's notes the return of the sheriff, the objection of counsel to further proceedings until all the jurors ordered were accounted for, and proceeds as follows:

"However, it appearing that some 30-odd jurors, of the 50 ordered summoned, have already appeared, the court sees no reason to waste several hours waiting for the remainder to appear. The court further says that, in the event there is a failure to fill the jury box from those present, the remainder of the 50, as soon as they appear, will be placed in the box and drawn, and counsel for defendants will be given full opportunity to reject them.

"The court, in writing this bill, adds that there was a failure to secure the jury from those present, and the next morning, in due time, the remainder of the 15, present in the parish, appeared, and their names were put in the box, accepted, and rejected. My recollection is that there were 3 others than those stated in the sheriff's return at the time who did not appear. One of these was in Virginia, and two, temporarily, in New Orleans.

"One of the New Orleans men returned in time, and his name ordered put in the box and drawn and tendered. All tales jurors who were accepted and sworn as jurors were selected by the jury commission, as provided by the act of 1914."

From all of which it would appear that, before the jury was completed, the defendants were afforded the opportunity to make their selection from the whole number of tales jurors who were ordered to be summoned, and who were to be found in the parish. But, even if that were not the case, and the jury was in fact completed before the returns were all in, it has been held by this court that such a condition, of itself and without a showing of fraud or injury, affords a defendant no just ground of complaint. State v. Anderson, 136 La. 261, 66 South. 966; State v. Warton, 136 La. 516, 67 South. 350.

[8] VII. The grounds relied on in the motion for new trial are covered by the bills thus considered.

The defendant George Williams reserved three bills of exceptions, to wit:

1. The sheriff and one of his deputies testified that they visited the pasture of George Williams and there found the cattle alleged to have been stolen, and also found Ursin Moore, Williams' hired man (and one of the defendants, who, however, was acquitted), engaged in skinning one of the stolen cows; that (by the deputy) Moore said to his wife, "They have got me; let him know right away;" that a little boy came, a few minutes afterwards, and "went to let them know, right away," and beat him (Carruthers) to George Williams'. The sheriff, after testifying to the visit to the pasture, to the finding of the stolen cattle, and its return to the owners, without protest from Williams, further testified that there was some conversation, in French, between Moore and his wife (which the deputy, Carruthers, translated for his benefit), and further as follows:

"Q. What next happened? A. As we were going on the way to George Williams' market, a little boy passed by us, and, as he got by, he ran into George Williams' butcher shop. * * * Q. Whose boy was that? A. Ursin Moore's boy. Q. Where did he stay? A. Stayed with Ursin Moore. Q. Did you watch him closely? A. I did. Q. Did he appear to be watching you? A. He did; he trotted along, and, after he had passed, he ran all the way. Q. Did you ask him anything about the note? * * * A. I asked what he was running in the road for— what he delivered to Mr. George Williams. He said, 'A note.' Q. What did George Williams say about the note? (Objection and ruling.) Q. Mr. Reed, when you first went up to where Ursin Moore was skinning the cow which Mr. Columbus Stine claims, who was with you? A. Mr. Carruthers. Q. Who was with Ursin Moore? A. No one. Q. Who came up? A. His wife. Q. Who else? A. That is all. Q. Was anything said between him and his wife? A. She spoke to him in French. Q. Did you start away with Ursin Moore? A. I did. Q. Did you see a boy that stays at his place? A. I met him on the road as he passed by. Q. Coming from where? A. Coming from Ursin Moore's place. Q. Did he appear to be watching you? A. He did. Q. Something unusual? A. Yes, sir; he followed along with the wagon, and, when he got by, ran. I saw the boy run into

George Williams' store. I then went up to the store and informed Mr. Williams that he would have to come with me. He then asked permission to go into the house and put on some clothes; and, while I was in there, I asked the boy what he had given to Mr. Williams, and he informed me that he had given him a note from Ursin Moore's wife. I then went into the house and asked Mr. George Williams to let me see it. He told me that the boy had put the note in front of him, but he did not see it—didn't know what became of it; didn't look at it. I then asked him to come and show it to me, and he told me that he didn't know what became of it."

Objections on behalf of other defendants (save Moore) that the testimony was inadmissible as against them were sustained. The bill reserved by counsel for George Williams recites that an objection was urged in his behalf, on the ground—

"that it was not shown that Ursin Moore's wife, or the little boy, * * * was a party to, or an agent of, the alleged conspiracy; * * * nor was the alleged messenger, or party who forwarded the message, charged with being a co-conspirator, nor is it shown what the paper was, or if the message came from a conspirator and was ever delivered to a co-conspirator."

The objection was properly overruled. The testimony clearly tended to connect Moore and Williams with the theft of the cattle, and also with the conspiracy, if conspiracy there was, to commit the theft. It was Moore, employed by Williams, and caught by the sheriff and deputy, in Williams' pasture, skinning one of the stolen cows, who said to his wife, "They have caught me," and who instructed her to "let him know, right away"; and the jury were entitled to know the facts, that Moore's boy immediately started, upon the run, and, passing the sheriff and the deputy, who appear to have been riding in a "wagon," reached Williams' house ahead of them and delivered to him a note, of the contents and whereabouts of which Williams, within a few minutes thereafter, professed entire ignorance. The wife and boy of Moore were apparently the vehicles of communication between the two men, and, if they were not really so, Williams could have shown it by producing the note.

There may be some doubt as to the admissibility of the testimony as to the boy's statement to the sheriff; but, in view of all the circumstances, we are satisfied that it could have added nothing to the information otherwise conveyed.

"Where the conspiracy is to be established by inferences drawn from a number of facts and circumstances," say the authorities, "the order of proof is discretionary with the court, and evidence of the acts and declarations of the supposed conspirators may be admitted at any time, dependent, finally, for effect, under the charge of the judge, upon the ultimate establishment of the conspiracy, and of the accused's connection therewith, to the satisfaction of the jury." State v. Gebbia, 121 La. 1105, 47 South. 39 (citing State v. Bolden, 109 La. 484, 33 South. 571; Wharton's Cr. Ev. [9th Ed.] §§ 698, 700, 701; 12 Cyc. pp. 435, 437).

[9] 2. Ursin Moore, having been called as a state witness, was asked, on cross-examination by counsel for George Williams:

"What did George Williams tell you, the morning after the show?"

To which he replied:

"He said: 'Well, you don't need to go to the store. I bought a bunch of cattle from Doc. Lebleu. I will go to the slaughterhouse and show you what ones to kill.'"

To which counsel for Doc Lebleu, and also counsel for the state, objected, and the objection was sustained, on the ground that the statement testified to was in the nature of a self-serving declaration on the part of Williams, which was not made by way of accounting for the possession of stolen property, when confronted with a demand for such accounting, to which the court adds that Williams was permitted to testify that, when confronted by the sheriff with having stolen the cattle, he told that officer that he had bought them from Lebleu, and to tell the jury how, when, and where he bought them, and that he made the purchase in good faith.

There is no doubt that a person charged with crime, whether murder or larceny, being a competent witness in his own behalf, may take the stand and give his version of the

circumstances upon which the charge is based; and it is also beyond doubt that evidence as to the declarations, out of court, of a person accused of either of the offenses mentioned is equally admissible in his favor, provided they constituted part of the res gestæ.

In State v. Thomas, 30 La. Ann. 602 (to which we are referred by Williams' counsel), defendant was charged with stealing a hog, and, on the trial, was denied the privilege of proving that, prior to the time at which the theft was alleged to have been committed, he had claimed the animal as his own. It was said by the court (among other things) that:

"As to the declarations of a prisoner in his own behalf, unless they form part of the res gestæ, they are not admissible for the defense. It is otherwise when they are a part of the res gestæ. To be such, it is not necessary that the declarations should be precisely concurrent with the act under trial; it is enough if they spring from it and are made under circumstances which preclude the idea of design. It is only when the declarations are distinguishable in point of time, and are open to the suspicion of being part of defendant's plan of defense, that they should be excluded. In this case the prisoner should have been allowed to prove that, prior to the time at which it is alleged that he took the hog, he had claimed it as his own."

In State v. Dellwood, 33 La. Ann. 1231, defendant, also charged with hog stealing, offered to prove that, on the day of, and immediately preceding, the theft, one Jenkins had asked him (defendant) to go with him to get his (Jenkins') hog, and this court said:

"We think the court erred in rejecting this evidence. The statement offered to be proved lacks no element necessary to constitute it a part of the res gestæ; and it seems to us to be legitimate evidence for the purpose of disproving the animus furandi."

In State v. Chretien, 35 La. Ann. 1032, the defendant was prosecuted for the larceny of a beef, and it was held that he should have been permitted to prove that his codefendant, a fugitive from justice, "had called on and induced him to assist him to go after the beef." The court said:

"To make declarations a part of the res gestæ, they must be contemporaneous with the main fact; not, however, precisely concurrent in point of time. If they spring out of the same transaction, elucidate, are voluntary and spontaneous, and made at a time so near to it as reasonably to preclude the idea of deliberate design, they are then to be regarded as contemporaneous. [Handy v. Johnson] 5 Md. 450. Applying those rules to the present instance, it does appear that the facts sought to be proved form part of the res gestæ, and that the accused should have been permitted to offer the testimony offered in support, to show his motive."

In State v. Young, 41 La. Ann. 94, 6 South. 468, defendant was convicted of the larceny of some article (not specified in the opinion), and she offered to show by three witnesses that, before the arrest, she had exhibited the article to them, telling them that it belonged to a certain person, that "she had taken it from the child," that she had, inadvertently and unintentionally, brought it away, that she intended to return it the next day, and that she repeated the same thing to the constable at the time of her arrest. The court held that the evidence should have been admitted to repel the idea of a felonious taking.

In two of the three cases first above quoted, the evidence held to be admissible related to declarations which may be said to have constituted the initiative movements in the actions which culminated in the offenses charged, and hence were parts, or ingredients, of the things done.

In the cases first and last above cited, the declarations of the defendants, held to be admissible, formed no parts of the things done, but were admitted upon the theory that, if true, they would exonerate the defendants from the felonious intent necessary to constitute larceny, and in the last-cited case, the court quoted from 2 Bish. Cr. Pr. pp. 381, 382, and cited other text-books to the effect that:

"It is the doctrine of reason, sustained by some of the cases, and not apparently contradicted by any, in a way requiring notice, that, when stolen property is found upon one, or in his possession,

attention should be given to his own explanation, then made, of how he came by it, and this explanation may be produced in evidence to the jury, in his behalf as well as against him."

Conceding, however, that attention should be paid to the explanation which one makes when stolen property is found upon him or in his possession, it does not follow that the time of courts and juries is to be occupied in hearing a defendant, charged with larceny, and all the witnesses summoned by him, tell of all the statements that he may have made concerning the acquisition of the stolen property, from the moment of the theft until that of the trial.

The general rule in criminal cases (and equally applicable in civil cases) is stated as follows:

"The statements and declarations of the accused in his own favor, unless they are part of the res gestæ, or unless they are made evidence by the prosecution, in producing the conversation in which they are contained, are not competent in his favor on the trial [citing cases from 26 states and from the courts of the United States, the District of Columbia, and Canada]. They are excluded, not because they might never contribute to the ascertainment of the truth, but because, if received, they would most commonly consist of falsehoods, fabricated for the occasion, and would mislead oftener than they would enlighten." 12 Cyc. 426.

Applying the rule thus stated to the instant case, we are of opinion that the statement, sought to be introduced in evidence, constituted no part of the transaction whereby defendant acquired possession of the cattle that he was charged with having stolen, was not made by way of explanation to a person who had found him in possession of stolen property, and, considering the circumstances under which and the person to whom it is said to have been made, that the testimony of the hired man that such statement was made to him as part of the instructions given to him with regard to his daily work, would have been as likely to have misled as to have enlightened the jury, and for those reasons was properly excluded.

3. This defendant reserved a bill to the overruling of his motion for new trial, but the argument in that connection is addressed to the single proposition that, if one of the defendants, charged with conspiracy, should be acquitted, the other should also go free, and hence that, if Artemo Lebleu should be granted a new trial, the same ruling should be made with regard to Williams. But Lebleu has not been granted a new trial, which leaves the argument without the premise upon which it is predicated. "Sublato fundamento cadit opus."

Judgment affirmed.

## On Rehearing.

PROVOSTY, J. While the rehearing granted in this case was without restriction, that is to say, reopened all the questions involved in the case, yet, as a matter of fact, the court was entirely satisfied upon all the points discussed, except upon that of the refusal to grant the continuance applied for on the ground of the absence of the witness Henry Hébert. On this point the argument in support of the application for a rehearing raised some doubt, the benefit of which it was thought the accused should have.

The reargument has not shaken the conviction of the court as to the correctness of the conclusions heretofore reached. Nor has it brought out any new matter which would make it necessary, or in any way useful, to add anything to the very full treatment in the opinion heretofore handed down of all the points involved, except perhaps that of the refusal of the continuance.

It may be said to be well settled in our jurisprudence that the absence of a witness is not ground for a continuance, unless the fact to which the witness would be expected to testify cannot be proved by any other available witness. Marr, Crim. Juris. p. 606. Whether this rule is applicable in strictness in a case where, as in the present one, the cumulative evidence sought to be obtained is

for establishing an alibi, may be questionable. True, in two cases where the defense was an alibi, the court has heretofore applied the rule. State v. Comstock, 36 La. Ann. 308;. State v. Hillstock, 45 La. Ann. 298, 12 South. 352. But the court in those cases adverted to circumstances which made the application of the rule in those particular instances evidently proper, and hence the cases cannot be said to be precedents for a rigid application of the rule.

In the instant case the motion for a continuance left it doubtful whether the accused might not be able to prove by an indefinite number of witnesses the fact expected to be proved by Henry Hébert. Accused alleges in the motion that "there are other witnesses by whom he might prove these facts, but does not know that he can do so"; and he also alleges that he "knows of no other witnesses by whom he can prove these facts." Such an equivocal affidavit as this is not good ground for putting off a trial, when there has already been one continuance at the instance of accused, and the witnesses are numerous, and it may not be possible to procure them all again at a future day. Continuances are largely within the discretion of the trial court.

Moreover, the motion for a continuance left it doubtful whether the accused would not have been willing to go to trial, if only he could have known positively that he might prove by some one other witness the fact which he expected to prove by Hébert, and the district attorney offered that in that event—i. e., in the event accused could not make this proof by any one other witness— the prosecution would admit that Hébert, if present, would so testify. After this offer of the district attorney there was all the less reason for granting a continuance.

The judgment heretofore handed down herein is therefore reinstated, and made the judgment of the court.