LAND, J.
 

 Defendants were jointly indicted, tried, and convicted of the crime of murder as charged. Each has appealed from a sentence to death.
 

 The record presents for review 101 bills of exception. We regret that this court should be burdened with the Herculean task of considering a four-volume transcript of 1,167 pages, teeming with bills of exception of every imaginable kind, when the bills before us worthy of serious consideration are comparatively few in number.
 

 
 *939
 
 Bill No. 1.
 

 This bill was taken to an amendment of the indictment as to the spelling of the surname of one of the defendants, by changing “Drehr” to “Dreher.” As no change was made as to the identity of the accused, the amendment was properly allowed. R. S. 1870, § 1047; State v. Lee, 127 La. 1077, 54 So. 356; State v. Evans, 135 La. 891, 66 So. 259; State v. Grimms, 143 La. 421, 78 So. 661.
 

 When defendants were arraigned, the ease was fixed for trial for July 25,1927. Because defendants were rearraigned after amendment of the indictment, and copies of same and of jury list were ordered served upon them, it is contended that their rearraignment automatically set aside the fixing of the case for trial, and that the case stands as if it had been tried without ever having been fixed and is therefore an invalid and illegal proceeding.
 

 This contention is not sound, as it is expressly provided in section 1047 of the Revised Statutes of 1870 that when an amendment is allowed by the court “on or before trial” in the Christian name or surname of any person named in “any indictment” for any crime or misdemeanor-, “the trial shall proceed, whenever the same shall be proceeded with, in the same manner
 
 in all respects
 
 as if no such variance had occurred or amendments been made.”
 

 Neither rearraignment of defendants nor service of amended indictment was necessary. As the case had to 'be proceeded with as if no amendment had been made, it is clear that rearraignment and service of amended indictment, unnecessarily, did not have the effect of setting aside the fixing of the case for trial. State v. Evans, 135 La. 891, 66 So. 259 ; State v. Grimms, 143 La. 422, 78 So. 661.
 

 It is true that this court held in State v. Hewitt, 131 La. 117, 59 So. 34, without the citation of any authority, that a district attorney, though he may amend an information, has no power to amend an indictment.
 

 Section 1047 of the Revised Statutes of 1S70, however, is to the contrary, and declares :
 

 “Whenever
 
 on or before
 
 the trial
 
 of any indictment for any crime or misdemeanor,
 
 there shall appear to be any variance between the statement in the indictment and the evidence offered in proof thereof * * * in the Christian name or surname, or both Christian name and surname, or other description whatsoever, of any person whomsoever therein named or described * * *
 
 it shall be lawful for the court before which the trial shall be had,
 
 if it shall consider such variance not material to the merits of the ease, and that the defendant cannot be prejudiced thereby in his defense,
 
 to order such indictment to be amended aeeording to the proof,
 
 both in that part of the indictment where such variance occurs and in every other part of the indictment which it may become necessary to amend; the trial to be had before the same or another jury, as the court shall think reasonable; and after any such amendment the trial shall proceed, whenever the same shall be proceeded with, in the same manner
 
 in all respects
 
 as if no such variance had occurred or amendments been made,” etc. (Italics ours.)
 

 This court has permitted indictments to be amended too often by the trial judge in the particulars mentioned in section 1047 of the Revised Statutes to question at this late date the right of the state to make such amendments.
 

 In State v. Lee, 127 La. 1077, 54 So. 356, it was held that on the day of the trial, but before trial, it was proper to permit an amendment of the indictment by changing the Christian name of the one alleged to be murdered, as such amendment is expressly authorized by Revised Statutes, § 1047.
 

 To the same effect is State v. Evans, 135 La. 891, 66 So. 259. In State v. Grimms, 143 La. 421, 78 So. 661, an amendment of the indictment was allowed under section 1047 of the Revised Statutes as to the name of both the victim -and the person accused of murder, as no change was made as to the identity of either.'
 

 
 *941
 
 In the Grimms Case, Mr. Justice O’Niell as the organ of the- court said:
 

 “The expression in State v. Hewitt, 131 La. 117, 59 So. 35, that the district attorney has authority to amend only bills of 'information, not bills of indictment, was unnecessary to the decision, and, being contrary to the statute, * * * must be regarded as an inadvertent expression.” Page 423 (78 So. 661).
 

 The amendment as to the name of the defendant in this case was, therefore, properly allowed.
 

 Bills Nos. 2, 3, 4, and 5.
 

 These bills were reserved to the overruling of four motions to quash the general venire and the panel drawn for the trial of the defendants, for the week commencing July 25, 1927.
 

 The ground of the first motion to quash is that defendants were deprived of the right to have a petit jury drawn from a general venire box containing 300 names, because, in supplementing these names, the jury commission duplicated four names, two of which were drawn upon the jury impaneled- to try defendants. Section 4 of Act 135 of 1898 as amended by Act 58 of 1904.
 

 Although defendants allege that the action of the jury commission in this matter resulted in great wrong, worked irreparable injury, and constituted a legal fraud against their rights, the record is barren of evidence to support such a charge.
 

 In the recent case of State v. Phillips, 164 La. 597, 114 So. 171, we took occasion to say:
 

 “To justify the sustaining of the motion to quash, on this ground, it should appear that some great wrong was committed, or that some fraud was practiced, in the selection of the venire. Errors of fact, causing the striking of a few names from the general venire list improperly, are not sufficient. Jury Commissions are not required to be wholly free from error in their proceedings. Section 15 of Act 135 of 1898; State v. Davis, 154 La. 295, 97 So. 449. In our view, this bill is not well founded.”
 

 The bill reserved is therefore without merit.
 

 The grounds of the second motion to quash are that the jury commission did not meet at the office of the clerk of the district court when the general venire was selected, and that the general venire and petit jury were not drawn by the jury commission as required by’ section 4 of Act 135 of 1898 as amended.
 

 Neither of these grounds is sustained by the evidence in the case. The clerk’s office in the courthouse at Franklin in St. Mary parish consists of the entire right-hand wing of the building, both basement and second story. There is one large .room and two small ante- , rooms upstairs, and one large room and one small anteroom downstairs, which comprise the office of the clerk of the district court. The meeting of the jury commission was held on July 14, 1927, in the anteroom on the lower floor, a part of the clerk’s office, and. the customary place of assembly for the jury commission.
 

 The manner of drawing the jury .was not irregular. The two witnesses to the drawing merely made out a list of names on a sheet of paper from the registration books, at the request of the clerk of the district court, who is an ex officio member of the jury commission. Neither of these witnesses selected any of the jurors, but the clerk wrote all names on pieces of paper and placed them in the general venire box, from which they were drawn by a member of the jury commission.
 

 The registration lists of any parish are a reasonably accurate guide as to the qualifica■tions of jurors. State v. Jackson, 153 La. 524, 96 So. 53.
 

 We find no error in the ruling of the trial judge.
 

 The ground of the third motion to quash is based upon the contention that there is a hiatus existing in the Jury Act, Act 135 of 1898, and especially in section 4, as amend
 
 *943
 
 ed by Act 58 of 1904, and in section 7, as amended by Act 155 of -1906.
 

 Defendants contend, in other words, that there is no law in this state providing for the drawing of a petit jury, and therefore that the jury convicting them was unauthorized and illegally drawn.
 

 In State v. Roberson, 159 La. 569, 570, 105 So. 623, it is held on application for rehearing that:
 

 “Section 14 of Act 135 of 1898 expressly provides for the impaneling of petit juries subsequent to the first petit jury drawn, in the same manner ‘as hereinabove provided’; i. e. as provided in section 4. There is therefore no merit in the contention that there is no law authorizing the drawing of juries 'in criminal cases.”
 

 The ground of the fourth motion to quash is that no women were chosen or selected by the jury commission to serve as jurors in the case of these defendants, one of the defendants being herself a woman, although advised by defendants prior to the selection of a jury to try them that Act 19 of 1924 and section 41 of article 7 of the Constitution of 1921 were in conflict with the Fourteenth, Fifteenth, and Nineteenth Amendments to the Constitution of the United States and discriminatory against the service of women on juries.
 

 Section 1 of Act 19 of 1924 prescribes the same qualifications for women for jury service as are prescribed for men by section 1 of Act 135 of 1898, except that section 1 of Act 19 of 1924 provides:
 

 “That no woman shall be drawn for jury service unless she shall have previously filed with the clerk of the district court a written declaration of her desire to be subject to such service.”
 

 Section 2 of Act 19 of 1924 declares:
 

 “That in the drawing and selection of grand and petit juries no distinction nor discrimination shall be made against any person on account of sex when such person meets the requirements set forth in section 1 of this act.”
 

 Act 19 of 1924 was enacted to carry into effect section 41 of article 7 of the Constitution of 1921, relative to the service of women on juries in civil and criminal cases.
 

 In commenting upon this section of. our present Constitution, in State v. Bray, 153 La. 108, 95 So. 418, the court said:
 

 “We have considered the proviso in section 41 of article 7 of the Constitution as if it discriminated against women. As a matter of fact, it is altogether favorable to the women, because it gives to each and every one of them the option of saying whether she shall be subject to jury service. It does, however, abridge the women’s right to serve on juries, in that it requires them to do something that is not required of men to make them eligible for jury s'ervice.
 

 “Our opinion in this case is in accord with the opinion rendered by the Supreme Judicial Court of Massachusetts on the 14th of March, 1921,. in Re Opinion of the Justices, 237 Mass. 591, 130 N. E. 685, and the opinion rendered by the Court of Errors and Appeals of New Jersey on the 20th of June, 1921, in State v. James, 96 N. J. Law, 132, 114 A. 553, 16 A. L. R. 1141.”
 

 It appears from the testimony of the clerk of the district court that no woman residing in the parish of St. Mary had signified by a written declaration that she desired to be subject to jury service. It was not legally possible, therefore, for the jury commission to draw a woman upon the panel selected to try defendants in this case.
 

 Since section 1 of Act 135 of 1898 declares that only “a * * * male resident of the parish” can be qualified for jury service, if Act 19 of 1924 conferring upon women the right to serve on juries is unconstitutional, then defendants are left Without shadow of right to complain that women were not drawn to sit as jurors in this case, as they would not have been qualified to do so had they been selected by the jury commission.
 

 It is clear that Act 19 of 1924 would be unconstitutional as a whole if it did not contain the proviso of section 41 of article 7 of the Constitution of 1921 “that no woman shall be drawn for jury service unless she
 
 *945
 
 shall have previously filed with the Clerk of the district court a written declaration of her desire to be subject to such service.”
 

 At most, section 41 of the present Constitution of this state is in the nature of a general exemption from jury service of women as a class, unless the option to serve is exercised individually in the manner therein prescribed.
 

 This section is reasonably permissive, as the exercise of the right to serve as jurors is not burdened with any arbitrary restriction imposed upon women because of sex or as a class, but has been incorporated into the organic law of the state solely for the purpose of avoiding compulsory service of women upon juries, contrary to their wishes to exercise such a privilege of citizenship.
 

 Moreover, the right of defendants is not a right to select, but to reject, jurors.
 

 The defendant Mrs. Le Bceuf has no more right to be tried by a mixed jury of women and men than the defendant Dr. Dreher. The Constitution of the state merely guarantees ' to each of these defendants “a speedy public trial by an' impartial jury.” Const. 1921, art. 1, §9.
 

 Bills 7, 8, and 13.
 

 Under section 11 of Act 135 of 1898, as amended by Act 113 of 1918, the drawing of talesmen from the tales jury box may be ordered by the trial judge, if the regular venire is exhausted, or if it appears that it will be exhausted.
 

 Objection of the defendants to the opening of the tales jury box before the regular venire was exhausted was therefore not well taken.
 

 Only three regular jurors had been selected before the venire was exhausted. The court ordered 90 names to be drawn from the tales jury box and to be summoned immediately for jury service. Of this number 27 were either excused, or had left the state or parish, or could not attend on account of illness. Eorty-four were present, and 19 fáiled to answer their names when the tales list was called in court. As the trial judge felt that the number in attendance was sufficient to meet the requirements of the ease and to complete the panel, he ordered the trial to proceed, without return having been made on 19 tales jurors’ names that had been drawn. Defendants complain that to allow this to be done is tantamount to giving to the sheriff the right to select the tales jurors, and has the effect of nullifying the Jury Act, Act 135 of 1898.
 

 It is within the discretion of the trial judge to determine how many tales jurors shall be ordered for a particular occasion, and equally within his discretion to determine whether a case on trial shall be delayed until the whole number ordered shall have .reported or been accounted for, or whether the jury for such case shall he completed from the talesmen who may have appeared when the court is ready to proceed with its business. Defendants show neither fraud nor injury, and are without just complaint. State v. Lebleu et al., 137 La. 1007, 69 So. 808; State v. Anderson, 136 La. 261, 66 So. 966; State v. Warton, 136 La. 516, 67 So. 350.
 

 It appears that the names of four talesmen, drawn from the tales jury box, had not been called to serve at any time subsequent thereto, and that, on adjournment of court for the day, the trial judge ordered the destruction of these names.
 

 It is provided in section 11 of Act 113 of 1918:
 

 “That the names of tales jurors drawn from such tales jury box and who do not serve shall not be returned to said tales jury box by the district clerk.”
 

 If the names of these tales jurors were destroyed prematurely, defendants have no just ground of complaint, as their right is to reject and not to select jurors, and as they show neither fraud nor injury resulting from such irregularity. State v. Thompson, 116
 
 *947
 
 La. 829, 41 So. 107; State v. Carricut, 157 La. 140, 102 So. 98; section 15 of Act 135 of 1898.
 

 Bills Nos. 6, 9, 10, 11, 12, 14, 15, 17, 18, and 19.
 

 Bill No. 9 was reserved to the request of the trial judge that counsel for defendant, who was standing in front of the trial table, fake his seat while questioning the jurors on their voir dire, the reason assigned by the court being that the request was made to avoid any fear or hesitancy upon the part of a timid juror, who might be called for examination on his voir dire. This was a mere matter of procedure and discipline in conducting the business of the court, and was evidently without prejudice to the defendants.
 

 Bill No. 12 was taken'to the halting of counsel for defense by the court in the cross-examination of the juror Louis Boudreaux on his voir dire as to his qualifications. It appears from the per curiam to this bill that counsel had repeated the same questions, to this juror as many as three times, and had been given ample opportunity to interrogate the juror as to his fitness for service.
 

 A court has a certain discretion in the conduct of trials, and hence may stop counsel from indefinitely prolonging the cross-examination of a witness or of a juror on his voir dire by repeatedly going over the same matter. State v. Wren et al., 121 La. 55, 46 So. 99 ; State v. Natcisse, 133 La. 587, 63 So. 182; State v. Walters, 135 La. 1071, 66 So. 364.
 

 Bill No. 6 was reserved by defendants to the following question propounded by the district attorney to the juror, William Ba.r-tell, on his voir dire as not proper:
 

 “After hearing all of the evidence both for the state and for the defense, would you be in the same frame of mind?”
 

 Immediately before this the juror had been asked this question.:
 

 “If the state makes out the case against the accused beyond a reasonable doubt, could you bring in a verdict of guilty that would sentence the accused to the gallows?”
 

 The bill reserved by defendants does not allege any prejudice to them by the overruling of the objection made to the question propounded to the juror by the district attorney.
 

 There is no suggestion as to lack of qualifications of the juror, who Was the first juror accepted by the state and defendants, and who was sworn and sat upon the panel during the trial. The bill is wholly without merit.
 

 Bill No. 14 was taken to the refusal of the court to halt the district attorney in his examination of the juror, Theophile O. Guillotte, as to his competency. The trial judge overruled the objection on the ground that the district attorney was within his legal rights, and had not indulged in indefinite and unnecessary repetition of the same questions. This is a matter within the discretion of the trial judge. No abuse of such discretion is shown.
 

 Bill No. 15.
 

 Counsel for defendants propounded to the juror, L. L. Tardiff, the following question on his voir dire:
 

 “If you afe taken as a juror on the trial of this case, you do not feel that you can disregard that opinion entirely, do you, and try this case entirely according to the law ‘and the evidence taken?”
 

 The question was objected to by the district attorney as not in proper form, and his objection was sustained by the trial judge. The juror had answered on his voir dire, when examined by the state, that he would base his verdict solely on the evidence adduced and on the charge of the court. Defendants propounded no further questions to the juror, who was later dismissed on peremptory challenge by them. No prejudice is alleged by defendants in the bill, and no injury is claimed to have resulted from the ruling.
 

 
 *949
 
 Bills 10, 11, 17, 18, and 19.
 

 All of these bills relate tc? the qualifications of jurors. Defendants contend that these jurors were disqualified by reason of their prejudice and bias, and because of their failure to understand the English language sufficiently to serve on the panel.
 

 We have read the questions propounded to tne jurors, and their answers on their voir ‘dire, but fail to discover any bias or prejudice disclosed against either of the defendants. These bills have been reserved to the competency of these jurors for their lack of knowledge of the law relative to the burden of proof, reasonable doubt, essential elements of the crime charged against defendants, and as to definitions of the terms “willfully,” “feloniously,” and “maliciously,” as applied to cases of homicide.
 

 The bills reserved are without merit, as jurors are not supposed to know the law, and are not incompetent because their crude opinions may not be in accord with the views of jurists and text-writers. Such questions are improper and should not be asked. State v. Perioux, 107 La. 601, 31 So. 1016; State v. Willie et al., 130 La. 454, 58 So. 147.
 

 We agree with the trial judge that the jurors challenged for cause are intelligent and sufficiently competent for jury service. Moreover, it appears from the per curiams to these bills that defendants had not exhausted their peremptory challenges at the time the panel was completed.
 

 In the trial of the several accused jointly, the peremptory challenges of the defense cannot be said to be exhausted as long as any of such challenges are left to one or more of the accused. State v. Breaux et al., 104 La. 540, 29 So. 222; State v. Shields, 33 La. Ann. 1410; State v. Creech, 38 La. Ann. 480; State v. Marceaux, 50 La. Ann. 1139, 24 So. 611.
 

 Bill No. 16.
 

 After the panel was completed and the twelve jurors had been sworn on the afternoon of July 28, 1927, the trial judge, before adjournment, handed down a written order amending the previous orders and rules theretofore made by him, fixing the continuous sessions of the court from October 1, 1926, to July 31, 1927, inclusive. By these amendments the sessions were extended in his judicial district from July 31, 1927, to and inclusive of August 15, 1927, and the session of the court in the present case was extended to the same date, August 15, 1927.
 

 This order was objected to by defendants merely on the ground that it was prejudicial. Under section 16 of the rules of the district court of St. Mary parish, it appears that such rules may be amended or changed at any time by the district judge. The order of extension was filed prior to the expiration of the special term at which accused wex-e to be tried, and which would have expired on the third day after such order was entered, had not such extension been made. As the public interest required it, and as the amendment of the rules of the court was made timely, the objection of defendants to such amendment is without foundation. It is apparent that it was not possible to try defendants within the three days of the term remaining after the impanelment of the jury in the case.
 

 Bill No. 20.
 

 When the coroner was on the witness stand the district attorney presented to him the diagram of a human body, upon which the coroner had marked the location of the wounds and incisions found by him at the inquest held upon the body of the. deceased.
 

 The diagram was not offered by the state as proof of the nature or of the, location of the wounds, but merely to aid the jury in a proper understanding of the testimony of the coroner, given from his own knowledge and personal inspection of the body of the deceased.
 

 
 *951
 
 We fail to find any prejudice to the defendants resulting from the admission before 'the jury of the diagram in question.
 

 A marked photographic enlargement of the palm print of Robert Dunn was admitted in evidence, although marked out of the presence of the jury, as enabling a witness to testify in such manner as the jury could clearly follow. State v. Dunn, 161 Ba. 577, 109 So. 56.
 

 Bills 21, 22, 23.
 

 All of these bills relate to objections to questions propounded to state witnesses as to the identity of deceased.
 

 These questions were asked by the district attorney, and are as follows:
 

 “Did any member of the coroner’s jury, or any other person present, identify that body as being that of James J. Be Boeuf ?”'
 

 “You say he had a thumb cut?”
 

 “What statement did you make about the rubber heels?”
 

 The first question was objected to by defendants as hearsay, the second as being leading, and the third as irrelevant.
 

 The question, “Did any member óf the coroner’s jury, or any other person, identify that body as being that of James J. Be Boeuf?” was not intended to elicit a hearsay statement, but to prove the mere fact of identification having been made in the presence of witness, who was the assistant coroner, and who answered the question affirmatively, without going into further details. The question was merely introductory to further proof. Thereafter all of the identifying witnesses were placed on the stand by the state and subjected to cross-examination by defendants. We find no prejudice resulting to defendants from the ruling of the trial judge permitting the question to be answered by the witness.
 

 The second question, “You say he had a thumb cut?” was not leading, as the witness had already testified that deceased had “a very short and stubby thumb, with nail cut across.”
 

 The third question, “What statement did you make about the rubber heels?” w-as asked by the state after the witness had testified that he had known deceased six or seven years, and had seen him, about a week before his body was found in Bake Palourde, wearing a pair of tan shoes with rubber heels, and that deceased had similar shoes on when the coroner took his body from the lake.
 

 In answering the question, the witness testified that on the way back from the lake he had mentioned to the assistant coroner what he knew about the shoes with the rubber heels. The features of deceased had become so disfigured as to require his identification by other means. The only effect of the answer of the witness was to show that he had communicated to the proper officer what he knew touching the identity of the deceased. The question, in our opinion, was not irrelevant nor prejudicial in any way to the defendants.
 

 Bills Nos. 24 and 25.
 

 Bill No. 24 was taken to the ruling of the trial judge in allowing the district attorney to ask a state witness the question: “Did you know any marks on the body of Jim Be Boeuf to assist you in identifying his body?”
 

 It is objected that this is a leading question. A verdict will not be set aside because the court allowed a leading question to be asked unless the accused has been prejudiced thereby. Prejudice is neither alleged nor shown in the bill reserved. State v. Coll, 146 Ba. 597, 83 So. 844; State v. Byons, 113 Ba. 959, 37 So. 890.
 

 Bill No. 25 was reserved to the ruling of the court in holding that the following question called for the opinion of the witness:
 

 “If Dr. Dreher and James Beadle had gotten into the boat, unless some one was there to
 
 *953
 
 take the ear away, the car would have had to stay there, would it not?”
 

 The witness had testified that he saw the defendants Dr. T.» B. Dreher and James Beadle, who were in an automobile together, stop the car and get out of it next to where the skiff or pirogue was. The ruling was erroneous but harmless error, as it is a self-evident fact that the car would have remained in its place if not disturbed.
 

 Bill No. 26.
 

 Defendants filed a motion for a continuance on account of the absence of a material witness. The district attorney admitted that, if the witness were present, he would swear to the facts set out in the application, and defendants announced that they were ready for trial.
 

 The absent witness having appeared in court, defendants requested the withdrawal of the motion, which was refused by the trial judge. The motion was a part of the public record of the trial of the case, and we know of no law granting to defendants the right to demand its withdrawal from the archives of the court. The ruling of the trial judge was correct.
 

 Bills Nos. 27, 31, 32, 47, 58, 61, 69, 73, 74, 75, 77, 84, 85, 86, 87, 93, 94, 95, 96, 97, and 98.
 

 The above bills relate to remarks made to the jury by the district attorney.
 

 The district attorney in the course of his argument to the jury made the following remarks:
 

 “In the annals of the history of the state of Louisiana, never has such a crime as this been committed.”
 

 “Did you ever-stop to think of the sorrow that Ada Bonner Le Bmuf has caused her old mother — the humiliation she has caused her — by sitting in this courtroom to-day?”
 

 “The Gray-Snyder case is exactly like this one.”
 

 “James Le Boeuf was killed by reason of craven cowardice.”
 

 “He was killed by the man who stole Jim Le Bceuf’s wife; not for the insurance on his life. He was killed by reason of cr.aven cowardice.”
 

 “I state to this jury if 100 men, if 1,000 men, if the entire population of the town of Morgan City, was here, they would all swear that previous to this crime having been committed, Dr. Dreher bore a good reputation, but since this crime was committed he lost that reputation.”
 

 It is elementary that testimony'as to good character is. unavailing against positive evidence of guilt. State v. Nicholls, 50 La. Ann. 699, 23 So. 980; State v. Simon, 131 La. 520, 59 So. 975. The district attorney had the right to express his opinion on the strength of the evidence adduced before the jury, and to contend that the defendant Dr. Dreher was guilty beyond a reasonable doubt. State v. Drummond, 132 La. 754, 61 So. 778. Dr. Dreher had placed his character at issue by calling a number of witnesses to establish it as good in the community in which he lived. The remark of the district attorney was made in answer to that evidence and was within legitimate bounds. It is well settled that remarks made by the district attorney argumentatively furnish no ground for setting aside the verdict. State v. Romero, 117 La. 1003, 42 So. 482; State v. Meche, 114 La. 231, 38 So. 152; State v. Spurling, 115 La. 790, 40 So. 167.
 

 All of the above remarks made by the district attorney appear, from the per curiams of the trial judge, to have been within the record, and to have been based upon matters within the knowledge of the jury. The Gray-Snyder case being a well-known event in current history, the state’s attorney was at liberty to refer to it. State v. Genna, 163 La. 717, 112 So. 655.
 

 As stated in the Genna Case:
 

 “District attorneys are entitled to argue their eases to the jury with the same latitude as counsel for the defense. It is a mistake to suppose otherwise. It is true-that they may not go' outside of the record to bring to the atten
 
 *955
 
 tion of the jury any facts connected with the case which have not been given in evidence; nor should they appeal to the prejudices of the jury (supposed or real); and if they do so they should be stopped by the trial judge and the jury properly instructed and directed to disregard such remarks.” Page 717 (112 So. 661).
 

 The district attorney, in the course of his argument to the jury, also made the following remark:
 

 “Mr. L. O. Pecot, one of the attorneys for the defendants Dr. T. E. Dreher and Mrs. Ada Bonner Le Bcéuf addressed you gentlemen of the jury and referred to one of the accused as a Judas Iscariot.”
 

 It appears that this statement or remark was not made by the attorney for defendants in the presence of the jury, but while the jury had retired under order of the court. On objection by counsel for defendants, the remark was withdrawn immediately by the district attorney, who requested the jury to disregard it. The court, at the solicitation of the district attorney, charged the jury accordingly. The trial judge also specially charged the jury to disregard and not consider any statement of counsel on either side, unsupported by the evidence, as they were the sole judges of the guilt or innocence of the accused, and their verdict should be based solely on the evidence heard from the witnesses and on the charge of the court.
 

 The presumption is that the prejudicial effect of an improper remark made by the prosecuting officer during the trial was nullified by the instructions of the court to the jury to disregard such remarks and to decide the case solely on the evidence. The exceptions to the rule are restricted to very extreme cases, such as an appeal to race prejudice, or an unfavorable comment on the failure of the accused to testify in his own behalf. State v. Easley, 118 La. 691, 43 So. 279; State v. Mitchell, 119 La. 374, 44 So. 132; State v. Heidelberg, 120 La. 300, 45 So. 256; State v. Dunn, 161 La. 532, 109 So. 56.
 

 In the examination of the defendant Dr. Dreher, the district attorney cross-questioned him as to a rope that was on the bow of the skiff on the night of the homicide. The witness was asked if he knew whether the rope had been changed “since this crime has been committed,” and how much of the rope defendant had on the skiff “the night the crime was committed” was used to tie the weights on the body of James Le Roeuf.
 

 The defendant Dr. Dreher was also asked by the district attorney on cross-examination the following question: “And for that reason were you willing to suppress a crime?”
 

 Defendants objected to the statements of the district attorney, while interrogating the witness, that a crime had been committed. The trial judge instructed the jury to disregard the statements of the district attorney and to base their verdict in the case solely upon the evidence and the charge of the court. The jury was cautioned not to consider the statements of attorneys on either side, unsupported by the evidence.
 

 The trial judge declares in the per curiams to these bills that there was no prejudice to the defendants because of the. statements made and reiterated by the district attorney. The law does not presume any injury after proper instructions given to the jury by the court, except in extreme cases. As announced in State v. Dunn, 161 La. 591, 109 So. 78:
 

 “Nor do we think that the verdict should be annulled because counsel reiterated the statement , after the court had ruled against him. Such' reiteration, if intentional, probably amounted to contempt of court, but it should not Carry with it the annulment of the verdict in the absence of injury to the defendants.”
 

 On cross-examination the defendant Dr. Dreher was interrogated by the district attorney as follows:
 

 “Q. Was it your conscience that hurt you, or the fact that you were locked up in jail?
 

 “A. My conscience didn’t worry me any; the fact I was arrested and all the trouble I was in.
 

 
 *957
 
 “Q. The fact that you were present at the killing, as you say you were, and you saw the deceased shot down and killed in cold blood, that did not work on your conscience?” Tr. pp. 686, 687.
 

 Defendants objected to this question, not as an improper question assuming a state of facts not testified to by the witness, or borne out by the evidence in the case, but as a prejudicial remark made by the district attorney in the presence of the jury.
 

 In reply to this objection, the district attorney stated to the court:
 

 “These three accused, Dr. T. E. Dreher, Mrs. Ada Bonner Le Bceuf, and James Beadle are charged in this indictment with having, on the 1st day of April, 1927, willfully, feloniously and of their malice aforethought killed and murdered one James Joseph Le Bceuf. The evidence of the state has been heard. Murder is the killing in cold blood, and I am of the opinion, at this time, that the evidence proving murder has been shown beyond a reasonable doubt.”.
 

 The district attorney unquestionably had the right to state what his opinion was as to the guilt of the accused based upon the evidence adduced in the ease. This is purely argumentative, and was a necessary statement to be made by him to the court in support of the question he' had propounded to the defendant Dr. Dreher. Out of abundance of caution, the trial judge instructed the jury to disregard the statement of the district attorney and to decide the case according to the evidence. We find no prejudice to the defendants under these circumstances.
 

 Defendant Dr. Dreher was being cross-examined by the district attorney, who propounded to him certain questions touching his credibility as a witness. The witness was then asked, as a preliminary question: “Were you in the courtroom when Mrs. Le Bceuf testified?”
 

 Defendants objected that the witness was one of the defendants, and “that the testimony of a codefendant cannot be considered for or against any other defendant. Purther, that this evidence does not form a part of the res gestte.” Tr. p. 1013.
 

 It appears that the district attorney, in arguing the objection of defendants to the question propounded by him to the witness, referred to the witness as “this coconspirator,” instead of “this codefendant,” in the presence of the jury.
 

 Defendants reserved a bill to this remark. The trial judge instructed the jury to disregard the remark and to consider only the evidence before them in arriving at their verdict. No prejudice to accused can be presumed under the circumstances.
 

 Defendants complain also of the following remarks and questions of the district attorney in the presence of the jury:
 

 (1) That counsel for the state “objects to the withdrawal of the jury at this time. I believe that the jury should hear the evidence of the sheriff until the time of the actual confession.”
 

 (2) The sheriff was asked if the questions propounded to him by counsel for defendants and the answers given by him “are questions and answers with reference to the confession made by Mrs. Le Bceuf at Morgan City in the district attorney’s offiee, and which confession the court has already ruled out and said was not admissible.”
 

 (3) “I would like for the evidence of this witness to be read, in order that the record may not be burdened with all of these bills of exceptions.”
 

 (4) “And when Dr. Dreher told you your husband’s body had been buried, you had no more interest in your husband, did you?” Upon objection, and before objection could be stated by defendants, the district attorney exclaimed: “Oh, yes!”
 

 (5) “That counsel for defendant was doing wrong in sitting next to the witness stand and between the jury and the witness stand.”
 

 (6) “This record is going to the Supreme Court, probably.”1
 

 
 *959
 
 The trial judge instructed the jury to disregard all of these remarks made by the district attorney and to rely entirely upon the evidence before them in arriving at a verdict. The lower court did not consider the defendants prejudiced by these statements, nor do we.
 

 “To justify setting aside a verdict of a jury, approved by the trial judge, on the ground of intemperate or improper remarks by a district attorney, this court would have to be thoroughly convinced that the jury was influenced by such remarks, and, as well, that the remarks contributed to the verdict found.” State v. Johnson & Butler, 48 La. Ann. 87, 19 So. 213; State v. Johnson, 127 La. 458, 53 So. 702.
 

 1 Jurors must be credited with some judgment, and it cannot be reasonably presumed that they will be influenced by every hasty or intemperate remark made by a prosecuting officer, especially when instructed by the trial judge to disregard same.
 

 Bills Nos. 28, 33, 34, 35, 41 and 29, 30, and 42..
 

 The sheriff, Charles Pecot, was asked by the district attorney the following questions :
 

 “tfou are sure that there -were no promises made, no inducements offered, no threats made, no violence used, or anything offered to Mrs. Le Bceuf previous to her making that confession in the reception room of the parish jail?”
 

 “What statement, if any, did the district attorney make to Mrs. Le Boeuf on the day she made the confession in the reception room of the parish jail, with reference to the confession she would give?”
 

 These questions were objected to by defendants as leading. The witness had already answered the first question by stating that there was no undue influence exerted to obtain the confession. The question was simply repeated by the district attorney for sake of positiveness. The second question, clearly, is not leading.
 

 The witness was also asked by the district attorney;
 

 “You stated to her that any statements she made would be used against her in the prosecution of this case?”
 

 This question was bbjected to on the ground that, at the time it was asked, the written confession of Mrs. Le Bceuf had been introduced by the state and read to the jury, and that the only evidence admissible concerning the written statement or confession was the statement itself.
 

 The question was asked on redirect examination. While it related to proof as to the foundation for the admissibility of the confession, such evidence was a mere repetition of that already adduced along that line, and was not prejudicial to accused. Defendants were entitled to recross-examination of the witness, had they so desired, but the bill fails to show that they made such request.
 

 The state was not attacking the statements contained in the written confession, but was merely attempting to show that they had been made after due warning that such statements would be used against defendant.
 

 The state placed the witness Gladstone Allen on the stand to prove a statement or confession made, in his presence and on different occasions, by Mrs. Le- Boeuf and by Dr. Dreher. Defendants objected on the ground that it was an attempt to introduce a . confession made by defendant out of the presence and hearing of the other codefendants, and was admissible only against the party making it, and, if held to be admissible, then jit was admissible only up to the point of the actual shooting.
 

 The confessions .were admitted by the trial judge only as to Mrs. Le Boeuf and only as to Dr. Dreher, with the statement at the time that the jury would be specially charged that each confession could ha,ve no effect as to the other codefendants. It is stated by counsel for defendants in the bill that anything
 
 *961
 
 happening after the shooting does not form part of the res gestae, and could not be admitted for the purpose of prejudicing the interest of the defendants in the mind of the jury. While this is true, the confession, as a whole and as made, must be admitted with proper instructions to the jury, for the protection of the other defendants prosecuted and fried jointly. State v. Donelon, 45 La. Ann. 744, 12 So. 922; State v. Sims et al., 106 La. 453, 31 So. 71; State v. Johnson, 47 La. Ann. 1230, 17 So. 789; State v. Gunter, 30 La. Ann. 536.
 

 We find no error in the ruling complained of by defendants.
 

 The same objections were made by defendants when the sheriff, Charles Pecot, was placed on the stand by the state for the purpose of testifying to statements or confessions made to him by defendant Dr. Dreher. The trial judge- made the same ruling, which is correct, in our opinion.
 

 Defendant Mrs. Ada Le Boeuf made three statements or confessions. On the day of her arrest, and prior thereto, she made a complete statement in the office of the district attorney in Morgan City, after several hours of intermittent questioning. This statement was made in the presence of Charles Pecot, sheriff. of St. Mary parish, and of Louis Blakeman, chief of police of Morgan City, and brother-in-law of defendant. . A few hours after the first statement, defendant Mrs. Le Boeuf made a second and similar statement in the parish jail in the presence of the dis: trict attorney and sheriff. A third statement was made by this defendant the 'following' day in the presence of the district attorney, the sheriff, and Mr. Gladstone Allen, a stenographer who reduced the same to writing.
 

 The first statement was excluded, as it had been made after advice to defendant by the sheriff to turn state’s evidence and to tell all she knew, and after advice to her by her brother-in-law that it would be easier for her if she should turn state’s evidence, and he promised that if she did he would do all he could to assist her in a legal way.
 

 The second statement, made in jail, was also excluded, although defendant had been warned that it would be used against her, as only two hours had elapsed since the first statement.
 

 Eighteen hours had elapsed between the second and third statements made by defendant. The last statement was made, in the office of the jail. The evidence shows an entire absence of any promises, threats, or undue influence resorted to or exercised to induce this statement. The defendant was also warned that any statement she might make would be used against her. The trial judge was of the opinion that the final statement was made freely and voluntarily. We find no good reason, after a review of the 'evidence in the case, to reverse his ruling admitting the statement in evidence.
 

 In State v. Hash, 12 La. Ann. 895, it is said:
 

 “The rule laid down in Guild’s Case, 5 Halst. (10 N. J. Law) 163- (18 Am. Dec. 404) is generally conceded to be sound:
 

 “ ‘In that case, upon much consideration, the rule was stated to be, that although an original confession may have been obtained by improper means, yet subsequent confessions of the'same or of like facts may be admitted, if the court believes, from the length of time intervening, or from proper warning of the consequences of confession, or from other circumstances, that the delusive hopes or fears, under * * * which the original confession was obtained, were entirely dispelled. In the absence of any such circumstances, the influence of the motives, proved to have been offered, will be presumed to continue, and to have produced the confession, unless the contrary be shown, and the confession will, therefore, he rejected.’ 2 Russ. Crimes, 838; 1 Greenleaf, Ev. 254.”
 

 See, also, 16 O. J. 722, § 1480.
 

 “As a rule, however, the effect of a misleading suggestion by a person in authority 'is removed by a later distinct warning or caution by one also having control in the proceedings to the effect that no such benefit will follow an incriminating declaration.” R. V.
 
 *963
 
 Hawes, 6 C. & P. 404; R. v. Bate, 11 Cox, Or. 686; R. v. Bond, 4 Cox, Cr. 285, 288; R.
 
 v.
 
 Collier, 3 Cox, Cr. 37.
 

 The objection that the statement made by the defendant Mrs. Le Bceuf was not admissible as a confession because it was not incriminatory is not well taken ior two reasons. In the first place, this statement, in our opinion, is plainly of an incriminatory character. In the second place, if it was not, then the objection went merely to the effect, and not to the admissibility, of the statement.
 

 The statement made by defendant Mrs. Ada Le Boeuf is as follows:
 

 “On our way to my sister-in-law’s, my husband stopped and took a boat. I don’t know whose boat; and we went out to my sister-in-law’s home. We stayed there a little while until about 7:30 p. m.; then we went out for a boat ride, on which we met another boat, and there were two shots fired, and in my excitement I just turned my boat around and came back. My brother asked where my husband was, apd I just said that he was at the corner waiting-for me, so-1 went on home and never said anything about it to any one. So the next morning the girl asked where Jim was, and I says: ‘Jim has- left town.’ This is all I said.
 

 . “The next night, Saturday, I met Dr, Dreher and I told him that I had lots of trouble, and he says, ‘What trouble?’ and I says, ‘Jim has gone.’ I did not tell him he had been shot, and I did not tell any one that because, if I had, they would have put two and two together, and might have said he did it. While I have never heard Dr. Dreher threaten my husband’s life, my husband threatened Dr. Dreher’s life many times. He even tried to get him to come to the house and had his rifle in the parlor. I don’t know whether he was going to use it, but still you can never tell.
 

 “On Friday night we had supper about 5:30, and Jim asked me, ‘Mama, let’s take a ride’; and I said, ‘Where do you want to go?’ and he said, ‘Just anywhere’; so we went out to my sister-in-law’s, Mrs. Bonner. We went to Mrs. Bonner’s house in the car. Before we went to Mrs. Bonner’s house, my husband suggested that we go boat riding, because we had often gone boat riding: We had two boats because one was too small. We had always been going in two boats. We took one boat down on the back of the car; I think it belonged to Charlie Garber. We got the boat at the corner and took it as far as my sister-in-law’s, where there was. plenty of water.
 

 “On Saturday afternoon, the day after the killing, Mrs. Rosalie Hebert, wife of Noah Hebert, brought me a note from Dr. Dreher in which the Doctor sympathized with me for all the trouble I was in.
 

 “On Saturday afternoon I had my car and had gone for a ride, and saw Dr. Dreher’s car. He never stopped me, but I stopped him. I got out of my car and sat down in Doctor’s car. I told him of all the trouble I was in. It was then I told him that Jim was done. I told him that I did not tell any one that Jim had been shot, because if I did they would put two and two together and might accuse him, and he says, ‘Well, Kid; that is just about what it would be.’ This' meeting was on Federal avenue at about 8 p. m.
 

 “They were just about eight to ten feet away when the shots fired. I was just back of Jim’s boat, and when the two shots fired, I turned and started home. Tire boat rocked a little, but did not turn over. I don’t know whether the boat Jim was in turned over.
 

 “When they got near us they said, ‘Jim or Bill, is that you?’ ” Tr. p. 141.
 

 The confession' of Dr. Dreher was made at his home when he was arrested by Sheriff Pecot and a deputy, and is shown to have been free and voluntary.
 

 The testimony of the sheriff as to this confession is as follows:
 

 “When I walked into Dr. Dreher’s home, I rang the door bell. One of his daughters answered the bell. I asked if the Doctor was in, and she said, ‘Yes.’ I said I wanted to see him. She went towards the back, .and in a few seconds the Doctor came out. He opened the screen door and told us to come 'in. I said, ‘Doctor, I have a warrant to arrest you.’ He said, T have been expecting it all evening. I knew you were coming to get me.’ He said, ‘This is hell. I have been in hell.’ He said, "That man has threatened my life so often that I have been in fear at all times that he would take a shot at me. I have kept my room in darkness, for fear he would take a shot at me through the window at night.’ He said, ‘Walk 'in here, apd talk to me.’ We walked in, and he went toward the back.
 

 “It was dark; no lights on in the back. He brought us into a bedroom. The Doctor and I sat on a bed together, and Mr. Blunt sat on another bed right next. There were two beds
 
 *965
 
 in the room. He said, ‘I did not do the killing; I did not kill James Le Bceuf myself.’ He said, T told James Beadle that James Le Bceuf had threatened my life, and I told him I was -living in hell; that I was in fear of my life at all times. I told him James Le Bceuf said he would kill me before the end of the week. And James Beadle said to me, ‘You bring that- — ,’ and he used a curse word, ‘out somewhere, and I will put him away, where he will never bother you or any one else again as long as you live.’ He said, T did not kill Jim Le Boeuf. James Beadle killed him. But he did it for me, and I am just as guilty as he is. He said, ‘Oh, why didn’t I do what I started to do? I started to shoot my head off, but I waited too long.’
 

 “He kept on repeating that over and over again. ‘Why didn’t I do what I started to do rather than go through all this?’ About that time, I asked Mr. Blunt, the deputy, to go out and tell people on the outside to drive away. He went out and told them, and they went off. He came back, and we were still sitting on the bed talking. Dr. Dreher ran his hand under the mattress on the bed, and I saw his movement and grabbed him, and Mr. Blunt grabbed him at the same time. He had a pistol in his hand, and he said he just wanted to give it to his wife. I left Mr. Blunt in the room, and walked toward the front where Mrs. Dreher and the two girls were. I told them I had this pistol. I went back in the room, and Mrs. Dreher and the two girls walked back into the room with me, all three of them crying.
 

 “They walked back in the, room with me crying, and grabbed the Doctor around the neck. They were all crying. The Doctor kept saying, ‘Oh, why did I wait too late? Why didn’t I do what I started to do this afternoon?’ He turned to his wife and he said, ‘Sweetheart, I have told you everything. I hope you will have faith in me, and believe what I have told you. I did not do the shooting. James Beadle did it for me, and I am just as guilty as he is.’” Tr. 307, 308.
 

 “ ‘How in the world did you get that woman to confess? No later than yesterday, or last night, she wrote me, telling me she would die before confessing. I can’t understand how you ever got her to confess.’ ” Tr. 311.
 

 When placed in jail, the defendant Dr. Dreher made practically the same statement as above, with the following added, as testified to by the sheriff:
 

 “In the jail Dr. Dreher told me that Jim Beadle killed Le Bceuf; that he had killed Le Bceuf for him. He said he had not done the shooting. He said Mrs. Le Boeuf wrote to him, wrote him a note, ,in which she told him that she and her husband were going on a boat ride, near the colored sehoolhouse, about 8 o’clock that night, or 8:30, ‘and you had better get 'him then, or he will get you.’ Something to that effect.
 

 “That he and Jim Beadle went out in the green pirogue belonging to him and Beadle, and Jim Le Boeuf and his wife came along, and they met in the neighborhood of the colored sehoolhouse, and that Jim Beadle shot Le Boeuf, and killed him.
 

 “I asked the Doctor, I said, ‘Doctor, after Jim Le Boeuf was killed, how did you bring him out on the lake?’ He said: ‘We tied his boat behind ours, and towed him out.’ . I asked him: ‘Who put the weights on him?’ He said: ‘We did.’ I said: ‘Who cut him open?’ He said: ‘Beadle did it; Beadle did it for me, and I turned my head while he did it. I am just as guilty as he is.’ I asked him what became of the boat Jim Le Bceuf was in. He said Beadle took it and destroyed it; broke it up.” Tr. 311.
 

 The following statement was made by the defendant James Beadle while in jail, and is admitted to have been free and voluntary: |
 

 “On July 1st, late in the afternoon, Dr. Dreher came to my house and asked me to go out with him hunting, which I did. When we got well advanced out in the pasture, he told me that he had come out there to kill that s-of a b-, Jim Le Bceuf. I said: ‘Doctor, don’t do that.’ He said, ‘Yes, I am going to- do it, and if you open your mouth about this, I am going to kill you’; and he made me pull the boat until we met that man, Jim Le Boeuf. When we met Jim Le Boeuf, Dr. Dreher said, ‘Jim, is that you?’ and Jim Le Boeuf said, ‘Yes, who is that?’ Dr. Dreher had his gun in his hands, and in a moment he fired two shots, ‘Bam! Bam!’ Dr. Dreher said, ‘Let’s go get that iron in that oak tree, and,’ he said, T want to sink that s- of a b — — in the lake:’ He almost worked the life out of me getting out to the lake. He tied the iron to his head and feet. Dr. Dreher then said, T am going to split him open so that he will never rise and’ be found.’
 

 “The Doctor and my lawyers want me to say that I did it all in self-defense, but I told them that I’d do anything to get out of this trouble. I told them that I had not done it.”
 

 The defendant Beadle did not take the witness stand during the trial. He was- found
 
 *967
 
 guilty of murder as charged, without capital punishment, and was sentenced to the penitentiary for life. He has not appealed.
 

 We agree with the trial judge that the statements of the defendants Mrs. Ada Le Boeuf and Dr. Dreher are incriminatory, were proven to be free and voluntary, and were properly admitted in evidence.
 

 Bill No. 36.
 

 When the statement of Mrs. Le Boeuf had been introduced by the state and read to the jury, further evidence as to the foundation for the introduction of the statement was objected to by defendants. In making his imling as to this objection, the trial judge remarked in the presence of the jury: .“This alleged confession or statement is not signed.” This remark was objected to by defendants as a comment on the facts of the case.
 

 The remark' of the judge was not a comment on the facts. The statement made by him was purely irrelevant, as it was immaterial whether the confession of defendant was signed or unsigned, and did not convey to the jury any impression whatever of the trial judge as to the guilt of either of the defendants.
 

 Bills Nos. 37 and 38.
 

 While Edville Plessala, a state witness, was under cross-examination by counsel for defendant James Beadle, he was asked if he had ever seen the defendants Dr. Dreher and Mrs. Le Bffiuf meet in Morgan Oity.
 

 This testimony was objected to by counsel for defendants Dr. Dreher and Mrs. Le Boeuf as irrelevant, incompetent, and prejudicial in the minds of the jury.
 

 Counsel for the defendant James Beadle then stated to the court that the object of the testimony was to. show the enmity, and the cause for enmity, that existed between Dr. Dreher and James Le Boeuf, in order to prove the one ■ who had an interest in killing deceased, and especially to prove the motive for the homicide.
 

 Defendants Dr. Dreher and Mrs. Le Boeuf further objected to this testimony on the grounds that its purpose was to prove a conspiracy, when the burden of showing a conspiracy rested upon the state; that as the object of the testimony was to show motive, the testimony could only be admissible against defendant himself, as these defendants are jointly indicted; that the defendant James Beadle could not be permitted to cross-examine a state witness on matters not brought out in the examination in chief, and not for the purpose of testing the credibility of the witness, and that the cross-examination of the witness on new matter, not brought out in the examination in chief, was objectionable as same was irrelevant and prejudicial to the defendants Dr. Dreher and Mrs. Le Bceuf.
 

 The trial judge was requested to dictate his per curiam to this bill to the stenographer. He declined to do so, and properly, in our opinion, as there is no law of this state requiring per curiams to bills of exception to be stated, prior to presentation of formal bill to the trial judge for his signature.
 

 . The objections to the testimony, sought to be elicited by the defendant Beadle, were overruled at the time for reasons then assigned. Later, additional reasons were given in the per curiam to this bill.
 

 Defendants’ cross-examination of a state witness is not confined to matters testified to by the witness on examination in 'chief. The defendant must be allowed to cross-examine the witness of the state as to any fact tending to establish his defense, whether or not the fact be connected with the facts testified to in the examination in chief. State v. Dunn, 161 La. 585, 109 So. 56; State v. Coll, 146 La. 598, 83 So. 844; State v. Thomas, 32 La. Ann. 349; State v. Swayze, 30 La. Ann.
 
 *969
 
 1327; State v. Monroe, 133 La. 612, 63 So, 241; State v. Wright, 40 La. Ann. 589, 4 So. 486.
 

 An infatuation for, or unlawful relation with, the spouse of the deceased, is always relevant upon the question of motive in homicide prosecutions. Whart. Crim. Ev. vol. II (10th Ed.) § 904, p. 1696.
 

 It was proper, therefore, for defendant Beadle to show a motive for the killing on the part of defendant Dr. Dreher, as tending to fix guilt upon him instead of upon the defendant B'eadle, as his defense was that defendant Dr. Dreher alone was guilty of the homicide. We find no error in the ruling complained of by defendants.
 

 Bill No. 39.
 

 The witness Rosalie Hebert, having been called by the state, was asked on direct examination the following question: “Since the last five years, have you ever delivered any message, or letters or notes, or anything for any one?”
 

 This question was. objected to by defendants Dr. Dreher and Mrs. Le Boeuf as irrelevant and inadmissible. The objection was overruled. The bill doesi not show wherein the evidence sought to be elicited is irrelevant. The ruling must be held correct, as the per curiam to this bill states that the question was “a preliminary one leading up to the evidence to show a planned, premeditated, and conspired homicide.”
 

 Bill No. 40.
 

 A state witness, having identified a knife found in the possession of defendant Beadle, at the time of his arrest, was submitted to defendants Dr. Dreher and Mrs. Le Boeuf for cross-examination, which was waived. Counsel for defendant James B’eadle then asked the witness the following question:
 

 “Do you not know it to be a fact that these two people (Dr. T. E. Dreher and Mrs. Ada Bonner Le Boeuf) met on several occasions at a negro woman’s house?”
 

 The question was proper, as stated under bills Nos. 37 and 38, but was answered in the negative by the witness. The bill is without merit.
 

 Pill No. 43.
 

 Charles Pecot, a state witness, was asked by the district attorney on redirect examination : “Did he (Dr. Dreher) make any statement to you as to any occurrence subsequent to the killing?”
 

 The question was objected to as a continuous repetition. As this was not the case, the objection was properly overruled.
 

 Bill No. 44.
 

 The defendant Mrs. Le Boeuf was asked the following question on examination in chief by her attorney:
 

 “Now, Mrs. Le Boeuf, would you have written this note to Dr. Dreher if you had expected your husband and Dr. Dreher to have trouble that night?”
 

 This question was objected to by the dis-. trict attorney on the ground that it was leading and that it was a self-serving declaration. This objection was sustained by the trial judge. As the witness subsequently testified to the facts sought to be elicited by this question, no injury is shown by the ruling. Not only error but injury must be shown to justify a reversal, based on a ruling excluding evidence tendered. State v. Dunn, 161 La. 532, 109 So. 56.
 

 Bills Nos. 70 and 71.
 

 These bills were reserved to the refusal of the court to allow the introduction of testimony to show the dangerous character of the deceased and previous threats made by the deceased against the lives of Dr. Dreher and Mrs. Le Boeuf.
 

 The only eyewitnesses to the homicide were the three eodefendants, Dr. Dreher, Mrs. Le Boeuf, and James B'eadle, who were
 
 *971
 
 jointly indicted and jointly tried for the murder of James Le Bceuf.
 

 , The codefendant James Beadle did not take the witness stand and testify in the case.
 

 The codefendants Dr. Dreher and Mrs. Le Bceuf, as witnesses in their own behalf, testified that the deceased was the aggressor in the difficulty, and fired the first shot without just cause or provocation. However, the district judge states in his per curiams to these bills that he did not believe the testimony of either of these codefendants as to the commission of an overt act by deceased at the time of the killing, and for this reason refused to admit testimony as to previous threats and the dangerous character of deceased.
 

 Counsel for defendants assert that, in making such statement, the trial judge usurped the province of the jury and passed on a question of fact that should be determined by the jury alone, and thereby disregarded his charge to the jury that under no circumstances were they -to regard the statements, confessions, or testimony of one codefendant either for or against another codefendant.
 

 The uniform jurisprudence in this state is to the effect that evidence of previous threats or of the dangerous character of the deceased, on the trial of a prosecution for murder, is not admissible until an overt .act or hostile demonstration has been proved to the satisfaction of the trial judge. State v. Harvey, 159 La. 674, 106 So. 28; State v. Poole, 156 La. 437, 438, 100 So. 613; State v. Benoit, 144 La. 276, 80 So. 329; State v. Boudreaux, 137 La. 227, 68 So. 422; State v. Varnado, 131 La. 952, 60 So. 627.
 

 When the question arises as to whether a sufficient foundation has been laid for the admission of such evidence, it is one to be decided solely by the court, which is necessarily vested with the discretion to disregard testimony it deems unworthy of belief. State v. Ford, 37 La. Ann. 443; State v. Janvier, 37 La. Ann. 644; State v. Jackson, 37 La. Ann. 896; State v. Harris, 45 La. Ann. 842, 13 So. 199, 40 Am. St. Rep. 259; State v. Christian, 44 La. Ann. 950, 11 So. 589; State v. Nash, 46 La. Ann. 210, 14 So. 607; State v. Beck, 46 La. Ann. 1410, 10 So. 368; State v. Green, 46 La. Ann. 1522, 16 So. 367; State v. Compagnet, 48 La. Ann. 1470, 21 So. 46; State v. Sandiford, 149 La. 951, 90 So. 261.
 

 In considering the question whether or not sufficient foundation has been laid for the introduction of evidence of the dangerous character of deceased, or of his previous threats against accused, the trial judge has the 'discretion of passing upon the credibility of the witnesses and the sufficiency of the evidence. 1-Iis rulings will not be reversed unless manifestly erroneous. State v. Ford, 37 La. Ann. 443; State v. Janvier, 37 La. Ann. 644; State v. Christian, 44 La. Ann. 950, 11 So. 589; State v. Compagnet, 48 La. Ann. 1470, 21 So. 46; State v. Golden, 113 La. 791, 37 So. 757; State v. Feazell, 116 La. 264, 40 So. 698; State v. Williams, 111 La. 205, 35 So. 521; State v. Forbes, 111 La. 473, 35 So. 710; State v. Perioux, 107 La. 601, 31 So. 1016.
 

 It is only when the evidence leaves it doubtful as to who made the attack that evidence of prior threats is admissible for the restricted purpose of proving who the aggressor was. State v. Sandiford, 149 La. 951, 90 So. 261; State v. Miller, 125 La. 254, 51 So. 189.
 

 When the trial judge decides that no overt act has been proven, -such conclusion of fact by him is not final and is subject to review on appeal. State v. Benoit, 144 La. 276, 80 So. 329; State v. Clark, 142 La. 283, 76 So. 714.
 

 The admissibility vel non of testimony tending to show previous threats, or,the dangerous character of the deceased, has been repeatedly held by this court to be a question of law to be decided by the trial judge, and not a question of fact affecting the guilt or
 
 *973
 
 innocence of the defendant, of which the jury is the exclusive judge. Const. 1921, art. 19, § 9.
 

 The trial judge has reviewed the facts of the ease at length in his per curiam to bill No. 71, and has given his reasons why he did not accept as true the testimony of Dr. Dreher and Mrs. Le Bceuf as to the commission of an overt act by deceased at the time of the killing.
 

 On account of the length of the reasons given by the trial judge in arriving at the conclusion that no overt act was proved on the part of the deceased, we shall merely state his finding that the homicide was planned, together with the following excerpts:
 

 “I did not believe the testimony of Dr. Dreher and Mrs. Le Bceuf as to the deceased having fired a shot. On the contrary, I believe .their version of the homicide is a true and correct one as contained in their respective confessions as to the deceased having been killed immediately upon Dr. Dreher asking, ‘Is that you, Jim?’ ”
 

 “The witnesses, three in number, who heard the shots, positively testify to hearing two shots and that both were gunshots; the deceased having been killed by shots from a shotgun. They testify positively to not having heard pistol shots, the shots having been fired about seven arpents away from their respective homes, being at their homes at the time.”
 

 “On taking the witness stand, Dr. Dreher and Mrs. Le Bceuf repudiated the confessions to the extent in adding that the deceased had fired a pistol at accused, Dr. Dreher and James Beadle, before the shots had been fired which killed him. The pistol is not in evidence, nor is there any explanation of its whereabouts.”
 

 “The homicide was committed on July 1, 1927, and the disappearance of the deceased was solved by the finding of his body on the evening of July 7, 1927, tied down with irons in the waters of Lake Palourde. The arrest of the accused followed on the next day.”
 

 “As stated, not only did the defense fail to establish by a preponderance of testimony the commission of an overt act or hostile demonstration, but the evidence and the physical facts convince me, beyond doubt, that the deceased was killed at a time when he least suspected an encounter, and before he was given opportunity of learning the identity of his assailants, or their object in calling him.” Tr. vol. I, pp.
 
 244r-
 
 247.
 

 In reviewing the conclusion reached by the trial judge, we have read with care the entire evidence in the case, and concur in his finding that no proper foundation was laid for the introduction of evidence of previous threats by deceased, or of his dangerous character, for the reason that the plea of self-defense is shown, by all of the facts and circumstances of the case, to be a pure fabrication.'
 

 Bills Nos. 64, 65, 66, 67, 68, and 72.
 

 These bills refer to cross-examination of defendants Dr. Dreher and Mrs. Le Bceuf, by counsel for James Beadle, codefendant, after defendants had been cross-examined by the state.
 

 This cross-examination was objected to by counsel for defendants Dr. Dreher and Mrs. Le Bceuf, on the ground that any statements made by either of these defendants could not be used
 
 for or against
 
 the eodefendant Beadle, and could have only a prejudicial effect as to defendants. This objection was overruled, and the testimony was admitted.
 

 The statement in the brief of the defendants (page 59) that the trial judge had already ruled out this testimony at the time the objection to same was made is erroneous, as is shown to be the ease by the per curiam to bill No. 66, by the recitals in bills 64 and 72, and by the record at page 875.
 

 As- appears from the per curiam to bill No. 64, the trial judge, in his general charge, instructed the jury to the effect that the testimony of a codefendant could not be considered by them for or against his or her co-defendant. In this per curiam, the judge a quo has given his reasons for permitting the cross-examination of the defendants by their codefendant Beadle, and, in the alternative, has stated that if this was.error, “then such was not prejudicial to the interests of the complainant in view of the charge of the court.”
 

 The circumstances surrounding the case, at the time of the cross-examination of de
 
 *975
 
 fendants by tbe attorneys for their codefendant Beadle, are detailed by the trial judge in his per curiam to bill No. 64 as follows :
 

 “All three accused, at the beginning of the trial, were jointly represented by one set of counsel. During the trial, and while the state was presenting its case, one of the defendants, James Beadle, moved the court that he be allowed separate counsel, he no longer ‘desiring to be represented by counsel of his codefendants.
 

 “The court, after interrogating the accused as to his financial ability to employ counsel, thereupon appointed two members of the bar to represent him. The defense of the then two sets of accused became antagonistic only to the extent as to who had actually fired the shots which killed deceased. The defense of Dr. Dreher and Mrs. Le Boeuf was that of self-defense. The defense of Beadle was that he had not participated in the commission of the homicide, his presence at the scene in company with Dr. Dreher being the result of an innocent purpose, he claiming to be a victim of circumstances arising from the friendship existing between him and Dr. Dreher.”
 

 The plea of self-defense tendered and testified to by the defendants Dr. Dreher and Mrs. Le Boeuf was not to the effect that
 
 either of them
 
 had killed the deceased justifiably, but that
 
 their codefendant, James Beadle, had done the actual hilling,
 
 after he had been fired upon by the deceased, the husband of Mrs. Le Bceuf.
 

 Beadle had
 
 denied self-defense
 
 in his confession,
 
 and in the defense
 
 made by him on the trial of the case. The testimony offered by defendants in support of the plea of self-defense would be evidence
 
 for
 
 Beadle, if the jury believed and accepted it; but if the jury disbelieved and rejected it, then Beadle would be placed before them as the actual slayer of deceased without just cause or excuse.
 

 The defendants were taking no chances at all as to their own necks in making a plea of self-defense
 
 for
 
 Beadle against his' wishes, and antagonistically to his defense in the case which was a denial of the commission of ^the homicide at all. This presents an unprecedented situation, and the case before us becomes sui generis in that defendants Dr. Dreher and Mrs. Le Bceuf have assumed to tender
 
 on behalf of
 
 Beadle, their codefendant, and to force upon him, a plea of self-defense, which he denies and repudiates in toto.
 

 Defendants might as well have pleaded
 
 insanity for
 
 Beadle at the time of the killing, although Beadle’s defense had been that he was sane and present at the commission of the homicide, but did not participate therein in any way.
 

 Well might defendants plead self-defense for themselves, if they had been the actual slayers; but when they attempt, as in the present case, to plead justifiable homicide based upon a plea of self-defense
 
 made by them for
 
 Beadle, they are wrongfully invading the constitutional and the personal right of their codefendant to plead for and to defend himself, as he may deem fit, and manifestly to his prejudice and to his injury. Const. 1921, art. 1, § 9.
 

 The case at bar, therefore, is not one where codefendants are asserting their right to testify in their own behalf in support of an independent defense made by them, but, on the contrary, it is one in which defendants have forced a plea of self-defense upon a co-defendant, to his peril and detriment, and yet seek to avoid any cross-examination whatever as to their own motives for the killing of deceased.
 

 Under the unusual and exceptional features of the case, counsel for Beadle, in our opinion, had the right to cross-examine the defendants, who dannot be permitted, in the case at bar, to shield themselves under the general rule of law in this state that a co-defendant cannot testify for or against another codefendant on trial, but may testify in his own behalf, although his testimony may be injurious or beneficial to his codefendant.
 

 On the other hand, if the irregularity
 
 *977
 
 of the cross-examination be conceded, on the ground of the incompetence of the testimony admitted against Beadle because he is a co-defendant, then we fail to find, under the facts and circumstances of the case, that any
 
 “manifest prejudice’’
 
 resulted therefrom to defendants. Neither of them, when cross-questioned by the attorneys for Beadle, claimed immunity from self-incrimination; neither admitted motive for the killing; neither confessed complicity in the homicide.
 

 When it is considered that both defendants had been thoroughly grilled by the able state’s attorney on cross-examination, and that their credibility had been severely tested before they were consigned to ¿he hands of the attorneys for Beadle for cross-questioning, it does not appear by any means that the latter cross-examination was
 
 manifestly
 
 to their prejudice, especially as the plea of self-defense tendered by defendants is without foundation in fact, as is shown by the per curiam of the trial judge to bill No. 71.
 

 In State v. Ernest Louviere, a murder case decided by this court February 13, 1928, it is said:
 

 “The ruling of a trial judge
 
 on matters relating to the relevancy and competency of evidence
 
 will not be disturbed unless
 
 the appellant shows clearly and succinctly
 
 not only that such rulings were
 
 manifestly erroneous,
 
 but also that
 
 they resulted in manifest prejudice to the cause of the'accused.
 
 When such conditions are shown, this court will promptly overrule the trial judge; otherwise not so.” (Italics ours.)
 

 See State v. Louviere, 165 La. 718, 115 So. 914, No. 29017 on the docket of this court.
 

 We find no error in the ruling of the trial judge.
 

 Bill No. 90.
 

 Captain E. T. Eorgey was asked in direct examination by the state:
 

 “Do you believe that Ada Le Boeuf could paddle a flat or a square-end pirogue from Emory Bonner’s house out to Solar’s Pass and back in three hours?”
 

 This question was objected to by counsel for defense on the ground that the witness was not qualified as an expert. The fitness of a person to testify as an expert is- a question of fact. The witness is shown by the evidence to have been fully qualified to answer this question. He had been in the logging business for 30 years, was a skilled operator of boats, whether propelled by motor or by hand, and had a thorough knowledge of distances as to the passes in question, and of currents, cross-currents, and tides.
 

 Bills Nos. 91 and 92.
 

 The state having commenced the introduction of its rebuttal testimony, the district attorney asked the witness, Charles Pecot, the following question: “Did Dr. Dreher ever tell you where the killing happened?”
 

 This question was objected to by counsel for defendants, for the reason that it was not proper rebuttal testimony, and for the further reason that if the purpose of the question was to elicit from the witness in rebuttal a part of the confession, it was not admissible as rebuttal evidence, since a confession must be produced as a part of the evidence in chief or not at all.
 

 In our opinion, the objections urged to the question are without merit.
 

 Dr. Dreher had stated in the confession made by him to this witness that the killing had occurred near a colored high school building in Morgan City. On direct examination he had not only repudiated this admission, but went further and declared that the killing-had taken place in one of the passes flowing between Elat Lake and Lake Palourde, a distance of at least three miles from the colored school building.
 

 In making this statement, he had testified for the first time in the trial to a different locality for the homicide. This was new matter brought out by the defense, and was necessarily subject to the right of rebuttal by the state. The purpose of rebuttal evidence is to disprove and discredit the evi
 
 *979
 
 deuce adduced on behalf of the defendant. The question of allowance of evidence in rebuttal is left largely to the discretion of the trial judge, and his rulings will not be disturbed except in extreme cases. State v. Blount, 124 La. 202, 50 So. 12.
 

 The same witness was asked by the district attorney the following question:
 

 . “When Ada Bonner Le Boeuf made a statement to you and me in the parish jail in the office or reception room, where did she tell you James Le Boeuf had been killed?”
 

 This question was objected to by counsel for defendants for the reason that the confession made by Mrs. Le Boeuf at the time was in writing and had been introduced to the jury, and for, the further reason that the testimony sought to be offered was not properly rebuttal testimony. This evidence was not strictly in rebuttal, as the written confession of Mrs. Le Boeuf, introduced in evidence, does not state that thé killing had occurred in the vicinity of the colored high school in Morgan City. However, Mrs. Le Boeuf had denied on direct examination that she had admitted that the killing had taken place near the colored school, and had testified that the homicide had occurred in one of the passes flowing between Flat Lake and Lake Palourde.
 

 In view of the fact that the statements or confessions of Dr. Dreher and of James Beadle were before the jury to the effect that the killing had occurred in the neighborhood of the colored high school in Morgan City, we fail to find any prejudice resulting to either of the defendants, Mrs. Le Bceuf or Dr. Dreher, by the admission in evidence óf the rebuttal testimony in the case of the examination of Mrs. Le Boeuf.
 

 Bills Nos. 45, 46, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 59, 60, 62, 63.
 

 These bills refer to the cross-examination of Mrs. Le Boeuf by the state.
 

 The objections urged against the questions propounded by the district attorney to this witness on cross-examination are that some of these questions were attempts to elicit the opinion of the witness; that others were examinations as to matters not brought out in examination in chief; that some were not cross-examinations but lectures of the witness by the State’s attorney; that others were put in prejudicial form; that some were not proper modes of cross-examination; that others were mere repetitions of the same question; and that some were inadmissible questions to test the credibility of the witness, as they were questions not upon points adduced on examination in chief.
 

 It is well settled that “when the defendant in a criminal prosecution testifies in his own behalf, his credibility is thereby put at issue, the same as is the credibility of any other witness who testifies in” his own behalf. State v. Bigner, 163 -La. 473, 112 So. 303.
 

 It is equally well settled that the state has no right to cross-examine the witnesses of the accused on matters not connected with, or germane to, the examination in chief. State v. D.unn, 161 La. 586, 109 So. 56; State v. Swayze, 30 La. Ann. 1323; State v. Wright, 40 La. Ann. 589, 4 So. 486; State v. Coll, 146 La. 598, 83 So. 844.
 

 However, the rule limiting the cross-examination of the witnesses for the defense to matters connected with, or germane to, the examination in chief, is not extended so as to include questions to test the credibility of the witness, for such questions relate to a matter germane to,the examination in chief, since the answers to them may affect the weight to be attached to the evidence of the witness. State v. Dunn, 161 La. 586, 109 So. 56; State v. Garner, 135 La. 746, 66 So. 181; State v. Johnson, 48 La. Ann. 437, 19 So. 476.
 

 The defendant, Mrs. Le Boeuf, had testified on direct examination that she was pres
 
 *981
 
 ent when her husband was killed and that she was an eyewitness to the circumstances' surrounding the killing.
 

 On examination of the bills reserved, we find that the questions propounded on cross-examination to defendant Mrs. Le Bceuf, were either on matters pertinent to, and connected with, matters elicited in examination in chief, or that they were questions asked to test the credibility of the witness. The cross-questions were therefore legitimate and within the well-recognized rule.
 

 We have examined with care the other bills reserved to the cross-examination of the defendant Mrs. Le Bceuf, and find no error in the rulings complained of by counsel for defense.
 

 Bills Nos. 76, 78, 79, 80, 81, 82, 83, 88, 89.
 

 These bills refer to the cross-examination of the defendant Dr. Dreher by the district attorney.
 

 The grounds of four of these bills are that the questions asked by the district attorney were repetitions of the same examination of the witness. This statement is denied by the trial judge in his per curiams to these bills. The objections urged are therefore without merit.
 

 Defendant had testified on direct examination that after the deceased had been killed, the body was cut open, weighted with irons, and cast into the waters of the lake. The witness stated that when the body was found, there was a question as to its identity, but that he had neither' time nor desire to view the body. The district attorney then asked the witness the question: “You didn’t care whose body it was, did you?”
 

 Under the circumstances, the question objected to was not improper cross-examination, nor prejudicial to defendant, as contended by counsel for defendants.
 

 The district attorney also propounded to the witness the following question, which was objected to solely on the ground of being prejudicial to defendant: “When you get into close quarters, your memory gets bad, doesn’t it?”
 

 The question was not altogether objectionable, in view of the fact that the witness had answered shortly before to the effect that he did not remember, when cross-examined as to the contents of his confession, which he had partly repudiated. The evidence attached to this bill shows that the question was not answered. The trial judge states in the per curiam to the bill that the question was withdrawn by the district attorney. The jury were also instructed to disregard any remarks made by any attorney concerning any witness, and were charged that they were the sole judges of the credibility of all witnesses who came before them. Under the circumstances, no prejudice resulted to defendant from the question asked.
 

 The district attorney, in the course of his cross-examination, made the following declaration to the witness: “You have testified that is the rope.” Counsel for defendant objected to this statement on the ground that it was not proper for the district attorney to 'tell the witness what he had testified to. Defendant had admitted that the body, of deceased had been weighted with angle irons, which had been tied to the head and feet with a rope taken from the bow of the boat occupied by defendant and Beadle at the time of the killing.
 

 When the question was asked, the district attorney had just taken the rope off the irons, then in the courtroom. The witness answered the question by stating that this rope was not the one used to tie the irons on the body of deceased, and that he did not know anything ¿bout it. No injury is shown to defendant by the question objected to by counsel for defense.
 

 The district attorney, in his cross-
 
 *983
 
 examination of the defendant, Dr. Dreher, propounded the following question: “Were you in the courtroom • when Mrs. Le Bceuf testified ?” This question was objected to by counsel for defendants on the ground that the testimony of a codefendant cannot be considered for or against any other defendant on trial.
 

 Counsel for defense occupy an anomalous position in this case as to the right of cross-examination of their clients. They contend that neither the state nor the codefendant James Beadle may be permitted to cross-examine either of the codefendants Dr. Dreher or Mrs. Le Boeuf, as the three defendants are jointly indicted and jointly tried. This issue arises under bill of exception No. 76.
 

 “The right of the state to cross-examine on matters pertinent to and growing out of or connected with matters elicited * * * in chief is settled beyond controversy.” State v. Feazell, 116 La. 264, 40 So. 698; State v. Willingham, 33 La. Ann. 538; State v. Stuart, 35 La. Ann. 1015; State v. Poynier, 36 La. Ann. 572; State v. Johnson, 41 La. Ann. 1079, 6 So. 802.
 

 “When the defendant in a criminal prosecution testifies in his own behalf, his credibility is thereby put at issue, the same as is the credibility of any other witness who testifies in the case.” State v. Bigner, 163 La. 475, 112 So. 303; State v. Morgan, 142 La. 778, 77 So. 588; State v. Suire, 142 La. 101, 76 So. 254; State v. Anderson, 135 La. 326, 65 So. 478.
 

 In McGruder et al. v. State, 71 Ga. 864, among other things the court said:
 

 “Where two defendants agreed to be tried jointly, with the right in each to testify on the behalf of the other, as if tried separately, each could be impeached ás a witness for the other.”
 

 In State v. Hardin et al., 46 Iowa, 623, 26 Am. Rep. 174, the Iowa Supreme Court said:
 

 “One of two indicted persons, testifying on behalf of his codefendant, is subject to impeachment like any other witness.”
 

 In State v. Pfefferle, 36 Kan. 90, 12 P. 406, it is said:
 

 “A codefendant who voluntarily became a witness, and has not appealed, was asked by the state on cross-examination if he had not recently been tried and convicted several times for the unlawful sale of intoxicating liquors, and over objection gave an affirmative answer. Held, to be no error.”
 

 “Where a defendant in a criminal case takes the witness stand * * * in his own behalf, he assumes the character of a witness, and is entitled to the same privileges, and subject to the same treatment, and to be contradicted, discredited, or impeached, the same as any other witness.”
 

 The bill reserved is without merit.
 

 Bill No. 99.
 

 Counsel for defendants complain in this bill that the trial judge allowed the district attorney more than the allotted time for his closing argument to the jury.
 

 This statement is denied in the per curiam to this bill by the judge a quo, who states that:
 

 “The district attorney did not consume more than the 15 minutes allowed to sum up.>
 

 “Defense counsel complaining did not consume their entire time, there being 35 minutes unconsumed, in addition to the 15 minutes allowed, in case of full use of time allowed.
 

 “The arguments, as to time consumed, were in accordance with the announced time fixed by the court.”
 

 The bill is frivolous and without the slightest merit.
 

 Bill 100.
 

 In this bill a general objection to the charge is made.
 

 In the per curiam to the bill, the trial judge states:
 

 “There was no objection or bill reserved to any portion of the charge. Even though the court allowed the reservation, which under the law can be refused, no bills of exceptions have been reserved and presented to me.”
 

 It is elementary that a general objection to the charge of the court presents nothing for review, as it is too vague and indefinite to be considered. State v. Varnado, 126 La. 733, 52 So. 1006; State v. Erwin, 133 La. 553, 63 So. 167.
 

 
 *985
 
 Bill 101.
 

 This bill was reserved to the refusal of the trial judge to grant a new trial, based upon alleged errors during the trial of the case, and upon the further ground of newly discovered evidence.
 

 The motion for new trial is divided into different articles, which are substantially as follows:
 

 (1) That the verdict is contrary to the law and the evidence.
 

 (2) That newly discovered evidence would be furnished by one Julius Slade and other unnamed witnesses to the effect that they were in Morgan City, La., during the early part of July, 1927; that they met a man by the name of Jim Beadle with whom they had a lengthy conversation, and that the said Beadle informed them (a few days before the body of Jim Le Bceuf was found) that he (Beadle) “had killed a man and had sunk the body, and that he was not worrying about it, because, if the body was ever found, it would be laid on a doctor who was running with the dead man’s wife”; and that said Beadle also said
 
 “he had had trouble with the deceased some time before, and could not rest until he had Mlied him, and expected the doctor would get the blame if anything turned up.”
 

 (3) That defendants did not receive a fair and impartial trial by reason of the seething and prejudiced mob in the courtroom in close proximity to the jury.
 

 (4) That certain jurors, unnamed in the motion, had stated that if they were taken on the jury they would hang the defendants.
 

 (5) That remarks were made by the crowd occupying seats immediately behind the jury, and were heard by the jury, who were prejudiced thereby against defendants.
 

 (6) That the court allowed telegraph instruments to be installed in a room adjoining the courtroom, and that this was prejudicial to defendants, as the activity of press reporters and wire operators distracted the attention of the jury.
 

 (7)That the court allowed representatives of a hostile and unfair press to place their tables, in some instances, within five feet of the jury, which of itself was unfair to your defendants, prejudicial to their interest, and prevented them from receiving á fair and impartial trial.
 

 The trial judge, in his per curiam to this bill, states that there was no proof offered by defendants to sustain the allegations contained in articles 3, 4, 5, 6, and 7 of their motion for a new trial; that the audience attending the trial was exceptionally orderly at all times; that there was not a single instance of hostility to defendants manifested by remark or act of any one present; and that persons present in the courtroom had been attracted there purely out of curiosity. The trial judge further states that at no time during the operation of the instruments were they heard by the jury or himself, and that there is no proof or merit in the charge that the representatives of the press were hostile or unfair.
 

 He further states that defendants have received a fair and impartial trial by a fair and impartial jury, and were ably represented; that the verdict is responsive both to the law and to the evidence in the ease; and that the alleged newly discovered evidence is unworthy of belief, and, if true and admitted, would be merely cumulative, and not sufficient, in his mind, to produce a different result as to the question of guilt of defendants.
 

 We find no good or sufficient reason why we should grant a new trial in the case.
 

 It is therefore ordered that the conviction and sentence of the defendant Dr. T. E. Dreher and that the conviction and sentence of the defendant Ada Bonner Le Bceuf, herein appealed from by defendants, ■ be and the same are hereby affirmed.
 

 
 *987
 
 O’NIELL, C. J., dissents and hands down reasons.
 

 OVERTON, J., dissents from rulings on bills 64, 65, 66, 67, 68, and 72.
 

 ST. PAUL, J., dissents and hands down reasons.